THE VOLUND.

(Circuit Court of Appeals, Second Circuit. July 26, 1910.)

Nos. 279–282.

1. COLLISION (§ 39*)—STEAM VESSELS MEETING—FAULT.

A collision on the Hudson river between the steamer Volund, passing up, and the steam yacht Normandie, passing down, *held*, in accordance with the finding of the commissioner, confirmed by the District Court, due solely to the fault of the steamer (1) in attempting to pass to the left under a two-blast signal without having obtained the assent of the yacht, (2) in not keeping to her own starboard side of the channel, (3) in not sounding alarm signals, but keeping on at full speed and repeating her two blasts when her first signal was not answered, (4) in crossing the one-blast signal of the yacht, (5) in not stopping and reversing when danger

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of collision should have been obvious, and (6) in not maintaining a competent and sufficient lookout.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 39; Dec. Dig. § 39.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. COLLISION (§ 115*)—TIME CHARTER—LIABILITY FOR COLLISION.

A time charter by which the owner is to provide and pay the master and crew, although providing that the master shall be under the orders of the charterer as regards "employment, agency and other arrangements," does not amount to a demise of the vessel, but leaves the owner responsible for her navigation. Nor is the charterer liable for a collision for which the vessel was in fault because she was at the time being navigated by a supercargo employed by the charterer as provided by the charter party who was acting as pilot with the consent of the master.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 115.*]

3. DEATH (§ 99*)—EXCESSIVE AWARD.

An award of $12,000 for the death of an engineer 31 years old, in good health and of good habits, who was earning from $1,300 to $1,500 a year and left a wife and child, held not excessive.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

4. COLLISION (§ 154*)—COSTS—PREMIUM PAID FOR STIPULATION FOR COSTS.

On recovery for collision, it is proper to allow the libelant as a part of his costs the premiums paid to a surety company for furnishing his stipulation for costs.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 154.*]

Appeals from the District Court of the United States for the Southern District of New York.

Suits in admiralty by Charles W. Dumont against the steamship Volund and the Higginson Manufacturing Company and by Eugenie Gracie, as administratrix of Stewart Gracie, deceased, Eliza S. Dodge, as administratrix, etc., of Gladys Dodge, deceased, and Joseph M. Hanigan, respectively, against O. Irgens and A. Irgens and the Higginson Manufacturing Company. Decrees for libelants against the Volund and the Higgins Manufacturing Company, and they appeal. Reversed as to the Higginson Company, and affirmed as to the Volund.

The following is Commissioner Herbert Green's report on reference to try the issues: .

"To the District Court of the United States for the Southern District of New York:

"An order was entered in each of the above causes August 2, 1906, upon consent of the parties, referring it to me, as commissioner, to hear the testimony and report my conclusions upon the issues of law and fact.

"I hereby report that the proctors for the respective parties attended before me and offered testimony with the exhibits, as filed herewith; and I further report as follows:

"In the evening of July 11, 1905, at about 8:30 o'clock, the Norwegian steamship Volund and the steam yacht Normandie collided in the North River opposite a pier which is referred to in the testimony as the 'brewery' dock, and which is something more than a quarter of a mile above the railroad station at Dobbs Ferry. The tide was the first of the ebb, the atmosphere somewhat hazy, and the wind light from the south. The ship, bound up, was on a voyage from Windsor, Nova Scotia, with a cargo of plaster consigned to the Higginson Manufacturing Company, at Newburgh. The

yacht was owned by Charles W. Dumont, and had beeen chartered by him to John A. Rudd, who lived near Yonkers and was aboard at the time of the collision. She left Yonkers between 7 and 8 o'clock in the morning, after lying there overnight, and then went down the river to a pier at Seventy-Ninth street, New York, where she took on a Mr. Green, who contemplated hiring her from Mr. Rudd for a cruise, and went aboard for a trial trip, accompanied by a Miss Gladys Dodge. The yacht went up the river to Tarrytown, stopped there for a time, then continued on as far as Peekskill, where she turned without stopping, and then came down until she met the ship and collided with her. The collision resulted in the immediate sinking and total loss of the yacht, and the death of her master, William H. Storms, her engineer, Stewart Gracie, and Miss Dodge. The suit of Dumont, which was brought to recover the value of the yacht and her equipment, was originally against the ship alone, but the latter's owners and claimants, O. Irgens and A. Irgens, of Bergen, Norway, filed a petition bringing in the Higginson Manufacturing Company as a respondent. The Higginson Company had the ship under charter at the time of the collision. The other suits were originally against the Messrs. Irgens alone, but on their petition the charterer was joined as a respondent, as in the Dumont Case. The suits of the administratrix of Gracie and the administratrix of Miss Dodge were brought under the New York statute to recover for the loss of the lives of Gracie and Miss Dodge, and the suit of Hanigan, who was steward and general utility man on the yacht, is for personal injuries and lost property.

"The ship was 235 feet long and 32 feet beam, her tonnage, 1,087 gross and 670 net, and at the time of the collision she drew 13 feet 8 inches forward and 16 feet 2 or 3 inches aft. By the charter, the charterer was to provide and pay for all pilotages, and there was also the following clause: 'That the charterers shall have permission to appoint a supercargo, who shall accompany the steamer and see that voyages are prosecuted with the utmost despatch.' The charterer employed one Nelson to sail on the ship, and he says that he 'supposes he was put there as pilot and supercargo,' and that he piloted over Nantucket Shoals, and the Sound, and the Hudson river. He was 65 years old, had made the same voyage with the ship on four previous occasions under the charter, and was on the bridge directing the navigation at the time of the collision. He held no American license, had never been licensed by local inspectors, and apparently the only license he held at this time was issued by the Province of Nova Scotia, and was an ordinary master's certificate for seagoing steam vessels. He testified that he had followed the sea since he was 11 years old, had been 'around here' 25 or 30 years, and was a member of the American Shipmasters' Association before getting the Nova Scotia certificate. It does not appear what his experience had been in navigating steam vessels in the inland waters of the United States; he merely says that he had been up the Hudson a great many times, and was familiar with it. The ship's captain was not aboard, having been landed at the Battery on the way up, along with a Hell Gate pilot who had charge of the navigation in coming down the East River. The captain's object in going ashore was to enter his ship at the Custom House, and he did this at the request of the charterer, to save time. The chief officer was 22 years old, and held a Norwegian mate's certificate only. Excluding the captain and Nelson, there were 16 men in the ship's crew. There was no one aboard licensed to pilot steam vessels in the Hudson river, and, according to Nelson, none but himself who knew the river.

"The yacht was 65 feet long and 14 feet beam, and her crew consisted of the captain, the engineer, and Hanigan, with Rudd lending assistance. The captain and the engineer were licensed men, experienced and competent for their position. Hanigan, a young man of 20 or 21, had joined the yacht the night before, and says that this was the first time he had served on a steam vessel. Neither he nor Rudd was competent to navigate the yacht, or knew the pilot rules, although both had had experience with launches, motor boats, and other small craft on the Hudson, and had picked up some of the knowledge required by navigators. Rudd had attened to the yacht's lights on the evening of the collision, according to his own and Hanigan's testimony. There is no doubt

that the lights had been properly set and were burning, and the yacht can be charged with no delinquency in that respect. The ship, also, had her regulation lights set and burning.

"After the collision the ship came to anchor, and sent out boats to look for those who had been on the yacht. Green, Rudd, and Hanigan were picked up after they had been in the water a considerable time, but no traces were discovered of Capt. Storms, or of Engineer Gracie, or of Miss Dodge, although all reasonable efforts were made to find them. The answers allege that the rescued persons were 'in varying degrees of intoxication,' and among the allegations of fault against the yacht is a charge that 'her officers, crew, and passengers were in a disorderly and incompetent condition.' The ship presented testimony on this subject concerning the rescued men, but I do not consider it sufficient to establish the charges as against either Rudd or Hanigan, and it is against both the testimony and the probabilities as to the captain and the engineer. It appears from the testimony of Rudd and Hanigan that Green brought three pint bottles of champagne aboard at New York, and when the yacht stopped at Tarrytown Hanigan went ashore by order of Rudd and bought three more bottles, in quarts. They state that there were no intoxicants aside from the champagne, and Hanigan, who had charge of the supplies, says that when he cleared away the things after supper the three quart bottles remained untouched in the ice box. Rudd, also, says that none of that lot had been used. Both Rudd and Hanigan testify that neither the captain nor the engineer drank any of the champagne, and Hanigan states that he himself had never tasted liquor. Rudd claims to have taken only one glass. The captain was over 60 years of age, and according to Hanigan had taken nothing but water and coffee during the day; and testimony from those who had abundant opportunity to know was to the effect that he was of irreproachable habits, and for a great many years had advocated and practiced total abstinence from alcoholic beverages. He had a long experience as commander of yachts, among them vessels of considerable size, had a pilot's license for the Hudson river, which he had navigated the greater part of his life, his reputation as a navigator was high, and he had handled the yacht for some time. There is also testimony that the engineer never drank.

"While the respondents were able to produce seven witnesses from the ship as to the occurrences immediately preceding the collision, libelants were of necessity limited to Rudd and Hanigan, as Green, who had nothing to do with the navigation, was able to contribute no useful information as to the movements and courses of the vessels, their relative positions, the lights they exhibited to each other, and the signals they gave. The account of the collision which Rudd and Hanigan give contains contradictions and inconsistencies, and is somewhat confused in details; but I saw no indication of an attempt or disposition to misrepresent the facts, and in its main feature their account is in accord with that set forth in the libels, and is confirmed in important particulars both by disinterested witnesses and the testimony for the ship.

"The libels allege that when the yacht was a short distance above Dobbs Ferry, proceeding at slow speed, near the mid-stream, she sighted the white and red lights of the ship, bearing on the yacht's port bow, and apparently headed so as to pass her port to port; that the yacht thereupon gave a single blast of her whistle, but the ship did not at once reply, and apparently continued her general course until within a short distance, when she opened her green light, gave two blasts, and swung rapidly to port, as though under a starboard helm; that the yacht's helm was ported and her engine reversed full speed, but the ship came on at high speed, apparently under a starboard helm, and her stem struck the yacht on the latter's port side about amidships, turned her over, cut her into two pieces, and caused her to blow up and sink almost instantly.

"The answers allege, in subsance, that at about 8 o'clock, while the ship was proceeding well inshore on the east side, she came within range of the light on Kingsland Point and steered generally for it, and when in the vicinity of Dobbs Ferry the bright light and the green light of the yacht, and for a moment the shimmer of her red light, were observed a little on the starboard bow; that the red soon disappeared, leaving the masthead light and the green light on the ship's starboard bow; that prior to this the speed of the ship had

been reduced, and she was making about five knots; that the ship gave a signal of two blasts, and slightly starboarded, and later, hearing no response, although the yacht continued to exhibit her green light on the ship's starboard bow, the ship repeated her signals of two blasts; that the yacht made no response to this, but continued to broaden slightly on the starboard bow of the ship, until, when broad on that bow, she swung across the course of the ship, as though under a port helm, and exhibited her red; that thereupon the ship reversed her engines and blew repeated danger signals, but the collision could not be thereby avoided, and the yacht fell across the stem of the ship, was overturned, and sunk; that after she had changed her course under a port helm, and at about the instant of collision, the yacht gave a sound, but this could not be identified as a signal; that owing to the condition of the atmosphere it was difficult to estimate distances accurately, but it is believed the vessels were about one mile apart when the ship gave her first signal of two blasts, about half a mile when she gave her second, and about 200 yards when the yacht ported; that the speed of the yacht was apparently in excess of 10 knots an hour, and was not reduced at any time before the collision.

"Rudd and Hanigan testify that all the way down from Peekskill the yacht kept west of wid-stream, and Hanigan says that when passing Nyack, which is some 4 miles above Dobbs Ferry, on the west shore, they were headed for the long pier at Piermont, just below Nyack, and were going slow, or, as he puts it, quarter speed, and, as far as he knows, the speed was not increased afterwards. Rudd says that they were going half speed, between 9 and 10 miles, but later changes his estimate to 8 miles, stating that he judged the yacht's full speed to be 10 or 12 miles, and, so far as he knew, no change of speed had been made since leaving Peekskill. Hanigan estimates that they passed 100 yards off the Piermont Pier, and Rudd ⅛ of a mile, and both testify that no change of course to the east was made before the collision, that the captain was at the wheel, and continued there up to the end, that Rudd was also in the pilot house, and Hanigan outside at the pilot house door, on the starboard side, where he had stationed himself by order of the captain to keep a lookout. They admit that there had been a period when the captain was absent from the pilot house, and that during his absence Hanigan steered, and that Green, Miss Dodge, and Rudd were in the pilot house at that time; but they assert that the captain returned, that Green and Miss Dodge then left the pilot house and went to the after deck, and the captain resumed the wheel. Hanigan states that this absence of the captain was not more than from 5 to 8 minutes, and was occasioned by his going to the toilet, that he came back with a tray containing his supper, which he ate on the seat in the pilot house, about 7:45, when the yacht was off Nyack, that Hanigan steered while the captain was eating, and then went aft, had his supper at about 8:15, cleared off the table, and returned to the pilot house, and that, although the sun was already down, it was not quite dark, both shores being visible. He says that he was forward fully 15 minutes before the collision. Rudd testifies that the captain ate his supper in the cabin, and was not absent more than a very few minutes, but other testimony of Rudd is to the effect that he was in doubt whether the captain ate his supper in the cabin, or merely went to the toilet. He also says that after he, Green, and Miss Dodge had had their supper, and were on their way to the pilot house, they passed the captain, bound from the pilot house to the cabin, that this was about a quarter to 7 or 7, that Hanigan was then alone in the pilot house, having left the cabin a minute before, that they were then 10 or 15 miles above Nyack, that the captain returned to the pilot house at least an hour before the collision, and after this he (Rudd) went to the after deck and talked with Green a minute or so, and then went back to the pilot house, getting there about 20 minutes before the collision and remaining until the vessels were almost together. Rudd further states that he had lighted the side lights before the captain left the pilot house. It was then twilight, and the collision occurred about 8 o'clock or a little later, or 20 minutes or half past 8. The almanac shows that the sun set at 7:28.

"I am satisfied that at the time of the collision Capt. Storms was in the pilot house at the wheel, directing the navigation of the yacht, that he had been thus employed at his post continuously from a time prior to the moment when either vessel could have sighted the other, that Hanigan was outside, at the

pilot house door, acting as lookout, and that the engineer was at his post, attending to his duties.

"Rudd and Hanigan testify that the captain first called attention to the ship, which was then showing a red light and a white light, about 1 or 1½ miles away, close in to the east shore, and bearing on their port side, apparently on a course parallel with the shore. Rudd says that this was 10 or 12 minutes before the collision, and Hanigan states that the ship was then about off Hastings, and the yacht about off Ardsley, heading for Forest Field Grove, a resort for excursionists on the west shore where lights are displayed, about opposite Hastings. According to the chart, Ardsley is about three-quarters of a mile north, and Hastings something more than one mile south, of Dobbs Ferry. On his cross-examination, Hanigan says that the yacht had just passed Piermont Pier. Piermont Pier is on the west shore about 1¾ miles north of Dobbs Ferry. Hanigan also states that a schooner had been ahead of the yacht, near mid-stream, and this vessel, which crossed to the easterly shore, showing her red light, shut out the ship until the schooner got in towards the easterly shore, and then the ship was opened up about 1¼ miles away. The presence of this schooner also appears from the ship's testimony. Hanigan says that there was another schooner, bound down, about one-quarter of a mile astern of the yacht, and no vessels were in sight other than these two. He further testifies that, when a mile or a mile and a half away, the ship showed only a glimmer of her white light in the bow, her red still showing strong, and, as the white had previously been strong, he judged she had veered to the east. His knowledge of light was not sufficient, he said, to enable him to tell how the diminishing of the white showed that she had turned away from the yacht; but he and Rudd both testify that the captain suggested that the vessel was a lighter bound for the brewery dock at Dobbs Ferry. Hanigan states that the captain said, 'I will give her a blast anyway,' that the blast was given, and the ship then 'turned round and opened her green on to us.' Rudd also testifies to the yacht's signal before the ship's turn to the west, and says that it was one whistle, was clear and distinct, and should have been heard aboard the ship. Rudd's attention being called to the fact that at a coroner's inquest he testified that the ship was only half a mile away when the yacht gave this signal, he said that he would abide by that testimony; the facts being fresher in his memory at that time. Hanigan is positive that this signal was not given after the ship's green light became visible, and also says that he is under the impression that later the captain pulled the whistle cord again; but elsewhere he says that he does not remember about this. Further testifying as to the ship's change of lights, Rudd says that after her red had been visible for a period which he variously states as a few seconds and a minute or so, and when she was half or three-quarters of a mile away, the white became stronger and stronger, and then he saw the green as well as the white; and he also refers to the red as disappearing, and the green becoming very prominent, when she was about three-quarters of a mile away. Hanigan says that the ship 'threw a slant,' and showed her green when 150 or 200 yards away, that she was then coming for them half the distance from the center of the river to the east bank, that the white came out full again, that all three lights were 'good and bright,' that she was then possibly three-quarters of a mile away, further down the river, to the southeast of the yacht, with her stem headed for the yacht's beam, and that he continued to see all three lights up to the time of the collision. Rudd says that she seemed to be coming towards them fast, and when her green had been visible not over 2 minutes, or 3 to 5 minutes, she blew two whistles, being then one-quarter of a mile away, 'right upon' them, heading for their port side. Subsequently he said that this estimate of distance was a mistake, and it should have been 150 or 200 feet. He also states that this was the first signal the ship gave, and that on receiving it their captain seized the cord, gave alarms, and rang to reverse, that the alarms continued until the yacht sank, and that the order to reverse was obeyed at once. He further says that when the alarms were given the ship was 100 or 200 feet away, but it was hard to judge in the excitement. He states that he is under the impression, has a faint recollection, that the captain repeated his single blast 30 or 45 seconds before he gave the alarms and the bell to reverse, was sure he did, but he himself ran

out of the pilot house to the cabin deck as soon as he heard the two blasts, and then the ship was 'right upon' them. He further says that the ship struck the yacht aft of amidships, turned her sideways, 'almost turtle,' pushed her over, cut her nearly in two, and he was thrown into the water, that when struck the yacht was headed down river, and that the ship came into her at an angle of about 45 degrees. Hanigan, also, testifies to the two blasts from the ship after she had made the change of course to the west, and this, he says, was her only signal, and was given when she was 100 or 200 yards away. He states that the captain rang bells to the engineer, but he did not know what they meant. The yacht 'was shivering,' however, and from that he inferred she was backing. The captain 'threw the wheel around, and just at that moment the steamer got right on us, and I left the pilot house, and our whistle was blowing, and I got up on top of the pilothouse, trying to get the boat loose, and before I had a hand on the boat I was in the water. * * * She kept shoving us against the tide, and she kept turning towards her. * * * In the engine room it looked to me as if the whole thing was on fire just in one flash. As soon as she hit the water it was just a flash.'

"Rudd, as well as Hanigan, refers to two schooners; but his testimony concerning them is not very clear. He states that both were bound up, and one, which was 'way down the river,' in towards the west shore, passed between the ship and that shore, was about three-quarters of a mile from the yacht when the ship was first sighted, and was just passing the ship when he saw the latter's lights change. She was just a little on the yacht's port bow; her course being between the ship's and the yacht's. The other schooner, Rudd says, was also 'way down the river' on the east side, about 10 minutes before the collision, and when the ship was sighted was 'dead ahead' of the yacht, about a mile below and about abreast of the ship, going towards the east shore. He could not see her lights. She had passed the yacht when the latter gave her first whistle, was on the west side about mid-stream when the ship's two whistles were given, was a little below the ship when the latter changed her course, and at that time she and the ship had already passed each other. He further says that the schooner which the yacht passed was about abreast of the yacht when the ship was sighted, and his impression is that she drove the ship over towards the east shore, and that was why the ship altered her course and came out towards mid-river when she had passed.

"Rudd stated that the place of collision was about a quarter of a mile west of mid-stream, but subsequently said that he was not sure of this, although it was west of mid-stream. Hanigan judges that the collision was about 150 yards west of mid-stream, but says that when the yacht was raised she was picked up still further west, which he accounts for by her being carried along by the ship.

"According to the ship's testimony, Toresen, the chief officer, was on the bridge with Nelson when the collision took place, and both had been there from the time they left New York at about 6:30 that evening, except that Toresen had gone below at about a quarter before 8 to get his supper; but he says that he merely had a cup of tea, and his absence lasted only about five minutes. It was also testified that Andersen, an experienced seaman, was at the wheel from 8 o'clock until the collision, and Hernsen, deck boy, a youth of 16, was lookout. The latter had joined the ship 4½ months before, but prior to that had spend 5 months on a training ship. He states that it was he who set the side lights at 10 minutes past 8, that he looked at the clock at that time, and immediately afterwards went on lookout, at about 8:15; that at the time of the collision he had been on duty about half an hour. Mikelsen, the chief engineer, says that he went off duty at 8 o'clock, and from that time until the collision was sitting on the saloon skylight, forward of the bridge, on the starboard side.

"Nelson testifies that, when the yacht was first sighted, there was sufficient light to see the outlines of houses on the shores, and both he and Toresen say that they were then a little below Dobbs Ferry, and their course N. ½ E. Toresen says that they had maintained this course for about 2 miles. Nelson, Toresen, Andersen, and Mikelsen all state that they were about one-fourth of the way across from the east shore, and, according to Nelson, they were going half speed, which he says was about 4½ knots. There is a light off Tarry-

town, 4 miles above Dobbs Ferry, referred to in the testimony as Kingsland Point Light, and Nelson says that it bore ½ point, and Andersen ¼ of a point, on the starboard bow, and they were steering for it. Nelson testifies: 'The man on the lookout said, "A light! A white light, and a red light"—no, "a white light and green light," at least, "on the starboard bow." And the red light glittered, he said. That was the mate. I said, "What did he say?" He said, "He says the red light flickered." ' Nelson further says that this red light was Kingsland Light flashing out; but this is contrary to the answers, and to the testimony, of other witnesses for the ship. Nelson states that he saw 'a green light and a little masthead light, no ways off, because she was skimming right down close on us,' bearing 1½ or 2 points on the starboard bow, 1 or 1½ miles away, and between ¼ and ½ a mile inshore of the ship. Hernsen testifies that, while he could not state the distance at which he first saw the yacht, she showed a white light a little on the starboard bow, which he reported as 'a bright light right ahead on the starboard bow.' One or two minutes later, the ship being then about three-eighths of the way from the New York shore, he saw both side lights, the green brighter than the red, bearing a little on the starboard bow, and he reported 'green and red light forward.' The red then gradually disappeared, the green only being visible, and bearing one point on the starboard bow. Toresen states that' he saw a bright headlight 2 or 3 miles away, bearing a little on the starboard bow, and Hernsen reported it ahead, that the vessel was all lighted up, and for that reason he took her to be a yacht; but Hernsen says that he could not make out what kind of vessel she was until she was about 600 feet away. Toresen states that Nelson used the glasses, and after a while he, also, used them, and saw the green light and a glimmer of red for a second or two, and Hernsen again reported, but he could not state what the report was. The deck log of the ship reads: 'At 8:15 we observed a small steamer under way, it headed right on us, so we could see both side lights; immediately afterwards we could see the green light full and just a little shimmer of the red light.'

"Nelson testifies that, when he saw the lights he describes, there was a schooner on his port bow, bound up, which had been with them all the way from New York, and was then not more than one-fourth of a mile away, about as far up the river as the yacht, perhaps not quite so far; that this schooner was hauling to the eastward across the ship's bow, to clear a tow coming down on the westerly side of the ship; that this brought the schooner right ahead, and he starboarded a little to go astern of her if he got up to her, began to do that "when she got getting across her bow"; that this schooner had been wing-and-wing until she thus hauled across, and then her foresail went over to her port side. He also says that the schooner's change of course could not interfere with the yacht's navigation, because the yacht was too far to the eastward; that he did not pay much attention to the westerly side of the river, because it was all foul with vessel bound up and down; that there were also boats quite a little distance ahead, coming down. Toresen and Hernsen also testify to the presence of other vessels in the vicinity. Toresen says that, when the yacht was sighted, a little schooner, presumably the same referred to by Nelson, was pretty close on their port bow, going up wing-and-wing, and that there was another little schooner, coming out from Kingsland Light on the port tack, headed for the west shore, showing a red light a little on their port bow, not making speed, but pretty nearly still, about 1½ miles away, not as far up the river as the yacht. At another time he says that he first saw the schooner with the red light after seeing the yacht, and she was then about a mile away; again, that he saw her light and the yacht's lights at the same time. Hernsen also refers to this schooner, and he, also, says that she was on their port side, on the port tack, but further up than the yacht, and he did not notice any lights on her. He mentions a third schooner, coming down and showing her red, bearing one point on their port bow, and sighted by him before he saw the yacht. He says that there were no other vessels there, but when he was setting the lights at 8:10 they passed a tow.

"Although Toresen and Andersen say that there was nothing to starboard, Nelson testifies that, because it was impossible for him to keep inshore of the yacht, he blew two whistles; the yacht being then about a mile away. He received no answer, and 'walked across the roof to see how things were there;'

the ship's wheel being steady. He then blew two whistles again; the yacht being between one-quarter and one-half a mile away, about four points on the starboard bow, bearing northeast, and the schooner under the ship's bow. He also slowed the ship, 'because I couldn't run over the vessel underneath our bow.' He says that he used his glasses, saw nothing but the yacht's green and white, and 'a lot of lights all over her'; and under his orders the wheelman starboarded a little. At the inquest he testified that he starboarded a little after giving his first two whistles, that he then kept steady on his course, except that he starboarded as the case required up to the time of the collision, and he was going half speed when he gave his second two whistles.

"Toresen, in describing what was done after sighting the yacht, says that by order of Nelson he gave two whistles to her; she being then about 1 or 1½ miles away, ½ or ¾ of a point on the starboard bow, and showing green and white, but no red. The wheel was starboarded a little, by order of Nelson but after the ship had gone to port about ½ point her wheel was steadied. Toresen says that the ship was prevented from going much to port by the presence of the winged schooner, which was being overhauled by the ship; and that when the signal was given the red light of the crossing schooner he described was on their port bow, and the winged schooner was about one-half a mile ahead, about 2 points on the port bow. He also testifies that no answer to the ship's signal was given by the yacht, and soon after when the two vessels were about one-quarter of a mile from each other, still showing green to green, Nelson remarked that he guessed the other vessel did not hear the signal. Then, by Nelson's order, the 2 blasts were repeated. Hernsen and Mikelsen also testify to 2 whistles twice from the ship, but Andersen could remember only one such signal, and says that when this was given he was ordered by Nelson and Toresen to starboard as much as the green light of the yacht 'was clear on the starboard side,' which at that time was about ¾ of a point. He could see the bright white light and the green a good mile away, pretty near ahead, about ¼ of a point to the starboard. Mikelsen says that on hearing the ship's first signal of 2 blasts he looked up and saw bright and green forward, a good way off, bearing about 1 point on the starboard bow, and could see no other light on the yacht; but, because his eyes were not good at night, he could not see how far away she was. He watched her from that time on, looking over the starboard side, for 6 or 7 minutes, and saw the red at no time until she made the sheer which he and the other witnesses on the ship testify to. He heard calls from the lookout, but did not notice what they were. He judges that the yacht was about a quarter of a mile further up river than the ship when the second signal of 2 blasts was given; the yacht's green light and headlight then bearing on their starboard bow.

"In describing the collision, Nelson says that the shore makes out along there, and, as the yacht came straight down on her course, she drew a little nearer to the ship, going like a race horse, 10 or 12 knots; that when she was at a distance which he at one time estimates as between 500 and 600 feet, and at another time as the length of the ship (235 feet) or a little more, and 1½ or 2 points abeam of the ship, 'just forward of the beam from amidships,' and while the ship was going slow, 1½ or 2 knots, the yacht 'just flickered around' towards the ship, then 'turned a little again to starboard, and then all at once he just made a flash for to cross our bow. And of course I went "toot, toot, toot." Then I reversed the engines full speed astern, and blew three blasts that my engines were going astern. * * * Just before he fetched up against our stem there was something went "puff" '—the yacht being then not 4 feet off. He states that this was the first sound that came from her, and at this time he noticed a man and a woman standing right forward of the pilot house. Hernsen says that he, also, saw a man and a woman; But they were on the after deck. The woman seemed excited and caught hold of the man, and the man took hold of the rigging. Nelson states that after being struck the yacht ran 1½ or 2 lengths to the westward, and gradually went down. He also says that the ship had stopped her headway at the time of the collision, and that immediately after it she anchored. At the inquest, he said that when she began to sheer the yacht was nearly abreast of his stem, just a little forward

of it, and between 300 and 400 feet to starboard. Toresen testifies that when the yacht was pretty nearly abreast of the ship, perhaps 100 feet further up river, about 7 points on the starboard bow, and about the ship's length away, she suddenly turned and tried to cross the ship's bow, but the distance was too short. He 'heard a little sharp whistle,' when she was coming over, her light changed, and he saw the red. She 'turned around like a cup,' and Nelson ran to the telegraph, rang to stop, and for full speed astern, ordered the wheel hard aport, and alarms to be blown, but the ship struck the yacht on the port side, about amidships. He says that he did not think there was danger of collision until the yacht took her sudden turn. Hernsen, Andersen, and Mikelsen say they heard no signal from the yacht, and they place the vessels in the same relative positions as Toresen when the alleged sheer was taken, giving the same distances, except that Hernsen says that the yacht was about a quarter of a ship's length further up the river than the ship, which would be about 60 feet, and Mikelsen about a ship's length further up. Andersen states that he, also, saw no change in the yacht's lights until she took the sheer; the pilot and the chief officer ordered him to lay his helm hard aport, and he put it as far over as he could, but did not get it hard over before the collision. Mikelsen says that he heard the bells to the engines and ran to the engine room, and when he got there he found the indicator standing at full speed and the engines reversing full speed.

"Toresen testifies that both the schooners he referred to were further up the river than the ship at the time of the collision, the winged schooner about the ship's length ahead, he says at one time, and, at another, two or three lengths, bearing about six points on their port bow. The other schooner he mentioned had passed their bow and crossed under the stern of the winged schooner, and was pretty near abreast of the ship, about 50 feet off. Hernsen says that at the time of the collision the two schooners he mentioned were on the ship's port side, a couple of lengths off. Andersen says that there was a schooner on the port side, far away.

"Two young ladies, Miss Mosher and Miss Shand, passengers on the ship, were sitting in front of the skylight under the bridge, and state that from this position they could see on both sides. Although she had previously seen the yacht, Miss Mosher says that her attention was not called particularly to her until the ship gave a signal which she said she could not describe more definitely than to state that it was more than one blast; that from that time on she kept her eyes on the yacht, which she describes as racing straight down on a line to the ship's right, quite close to the ship, not changing at all, showing a bright masthead light and lights all over her; and that she could not remember about the colored lights. Miss Shand also says that the yacht was to the right, quite far away, coming very quickly, showing her masthead and green lights, and being otherwise brightly lighted. She says that she, also, watched the yacht from that time on, and heard three sets of signals from the ship, the first two being more than one blast, but how many she could not state; that the ship seemed to turn to the left to make more room for the yacht, and just before the last signal there was an order from the pilot, and the ship kept going towards the left. Miss Mosher testifies: That a second signal was given by the ship, like the first. She heard an order from the pilot. The ship seemed to head over towards the left-hand shore, and she noticed that the yacht was not going to get out of their road, but seemed to be drawing closer. That, just as the yacht got up close to the ship, she went straight across their bow, the ship gave some little quick toots, and the pilot called out to the yacht to get out of the way or she would be run down, and ordered full speed astern on the ship. That she herself ran to the bow on the left side, and could see that the yacht did not get past at all, but when struck went right down bow first, and did not come to the surface again. Miss Shand says that when almost abreast of the ship's bow, not more than one of her own lengths away, the yacht turned very quickly to cross in front, and struck the ship just as she had gotten about half way across. Neither of these witnesses saw any other vessels there.

"The testimony from those aboard the ship that the yacht gave no passing signal whatever is contradicted by Bystrom, a resident of Dobbs Ferry, who was called as a witness for the ship. His house is on the bluff overlooking the river, and he says that it stands about 100 feet above the railroad, and 300 feet back from the river; that the trees in front have been cleared away for a space of 300 or 400 feet, and this gives an open view up and down the river for a much greater distance. He testifies that he saw the collision from his piazza, and describes the night as cloudy, but moonlight, and says that he could see over to the opposite shore; that the trees are very thick on both sides of the opening, but through those on the upper side he saw a red light going south, very close to the line of the terrace and about 200 feet off shore, and later, through the trees on the lower side, saw a green light about 100 feet further out in the river; that when the vessels were at a distance from each other which he estimates as about 400 feet, not more than a minute or two before the collision, the descending vessel gave a shrill whistle of one blast, which he likened to that of an auto boat, and this was followed by a signal from the other. On the reference he testified that the ship's signal was more than one blast; he could not say how many. At the coroner's inquest, held shortly after the collision, he said that the vessels were about heading for each other, that not only was he positive that he heard the yacht blow her signal first, but there was no question in his mind that the ship's signal, which he then said came a few seconds after the yacht's, was two blasts, and that the green light did not move as far as he could see, was in the same position as long as he followed it, was steering the same course exactly. If the positive testimony of Rudd and Hanigan that the yacht gave one whistle before there was danger of collision is credited, this testimony would confirm Rudd's that a second signal of one blast was given by the yacht. Although Nelson says on the reference that the yacht was from one-quarter to one-half a mile away when he gave his second signal, at the inquest he testified that the ship was then a little above Dobbs Ferry. This would be about the place of collision, and indicates that he gave the signal when the vessels were almost together, confirming not only Bystrom's, but Rudd's, testimony that the ship was 'right upon them,' and Hanigan's, that she was 100 or 200 yards away, when she gave two whistles. Bystrom further testifies that when the red came into view he saw that it was on a yacht, that both vessels appeared to hold their course until about 100 feet apart, and then the red and all the cabin lights of the yacht suddenly disappeared, the ship struck her about the middle with a tremendous crash, the red light came out astern of the ship as the latter moved forward, and then suddenly disappeared. Before the coroner he testified that 'the little boat must have been some on the land side, but that couldn't be seen from where I sat.' He further says that before the collision the yacht was going the faster, the steamer so slowly that he at first thought she was a tow, that neither vessel changed her speed, and that all the incidents he describes occurred within a space of 500 feet. But his estimates of distance are of doubtful value. He says the river is almost two miles across, and admits that because he viewed the occurrence from a position above the river, and back some distance from it, his estimates may be at fault; but he states that the ship was surprisingly close to the shore; vessels of her size usually going further out.

"Nelson's testimony that the ship was below Dobbs Ferry when he first saw and signaled the yacht, and the yacht from 1 to 1½ miles away, would indicate, if accepted, that the yacht was not going at any such relative speed as he and the other witnesses for the ship represent, since to reach the place of collision the ship must have traveled about as far as the yacht. This exaggeration of the yacht's speed is accentuated by Nelson's testimony at the inquest that the collision took place 15 or 20 minutes after the first signal he claims to have given her, and by the entry in the deck log that the yacht was sighted at 8:15, when the entry is considered in connection with the fact that the collision took place at 8:30. But it is improbable that any such period intervened. Mikelsen testified that as far as he knew the ship was going full speed ahead at the time the yacht made the alleged

sheer; and that entries in the engine log indicate the same thing. Toresen says that he could not be certain, but judges that they were going full speed up to the time of the yacht's sheer, and full speed was between 8 and 9 knots; that, except when they slowed for the other vessels, they went up the river at full speed, but because of the head tide they were not going between 8 and 9 knots. At the time of the collision, however, there was not sufficient tide to have a considerable effect on the ship's headway. I find, therefore, that the yacht was not proceeding at excessive speed, that her speed did not exceed that of the ship, that the ship was not going half speed either at the time Nelson says the yacht was sighted and he gave the first whistles, or when he says he gave the second 2 whistles, and that he did not slow after giving the second 2 whistles, as he testifies, but that full speed was maintained until the moment of collision.

"If the ship had been an American vessel, the employment of Nelson to navigate her on the Hudson river would have been unlawful under section 4438 of the Revised Statutes (U. S. Comp. St. 1901, p. 3034). It has been held that the fact that one of two colliding vessels is navigated by an unlicensed man, in violation of this statute, should be regarded as an important circumstance in determining which vessel is at fault when there is a conflict of testimony. The John F. Tolle (C. C.) 12 Fed. 444; The Robert Jenkins (D. C.) 22 Fed. 797; The Eagle Wing (D. C.) 135 Fed. 826; The Henry O. Barrett, 161 Fed. 481, 88 C. C. A. 423. In The Eagle Wing, the court held that there is a presumption that this circumstance caused or contributed to the collision, and the vessel so navigated has the burden of proving that it could not have done so. That Nelson's navigation excited some apprehension on the part of Toresen, the chief officer, is apparent from the latter's testimony. He testified at the inquest, according to the stenographic report, that at about 8:15 he saw a little bright light right ahead, 'a little aport from the starboard bow, and when he comes on I see a red light and green light, and so I tell the pilot to keep off a little, red light forward and a white light.' Although Toresen denies that he so testified at the inquest, he testified on the reference that, when he first saw the yacht, he suggested to Nelson to give a signal; that Nelson did not adopt the suggestion, said, 'Oh, he is all right,' went over to the port side of the bridge and back before giving the order for two whistles; that a little while after this signal had been given, 5 or 6 minutes before the collision, he said to Nelson, 'That fellow is coming green,' and Nelson answered, 'Yes, that is all right'; that Toresen saw they would 'pass him close,' and suggested to take the ship over a little, by which he says he meant to port side, a starboard wheel; that Nelson said, 'No, he is all right,' and went to the port side of the bridge again, and then said, 'Tell them to go astarboard a little'; and that no other order was given to starboard. According to this, the first signal of two whistles was given when the vessels were meeting end on, or nearly so, and the wheel was not starboarded until the signal was repeated, when they were at a distance which Nelson estimates as between one-quarter and one-half a mile, and Toresen one-quarter of a mile, with the yacht approaching at a speed of 10 or 12 miles, as they assert. And if the courses of the vessels were so close together that the yacht could suddenly whip across the other's bow in the manner asserted, it would seem that the vessels must have continued end on, or nearly so, notwithstanding the ship's claim that green was opposed to green. Although the testimony of Nelson, Toresen, Mikelsen, and Hernsen that the red had been shut out and did not appear again until the sheer was made is corroborated by Miss Shand so far as she testifies that she saw the green after her attention was drawn to the yacht, she does not state that the red was not visible at any time, but does say that the yacht was not more than one of her own lengths away when she sheered. If that was so, it would seem that the red must have been visible as the yacht approached. Miss Mosher says that both before and after the ship's second signal she thought that if the yacht did not get out of their way she would hit them, would skim past, but strike the ship about the middle of the latter's right side, and that her course was so close that it seemed as if a person could almost have touched her from the ship's bow.' Nelson says that the vessels would have passed 1½ lengths

clear of each other if the yacht 'hadn't flopped around.' This is only about 350 feet.

"Under these circumstances, whatever the faults of the yacht may have been, the ship's testimony indicates fault on her part in failing to go to the right and pass on the yacht's port side, there being no assent from the yacht to a departure from the rule; yet she went ahead at full speed even after giving her second signal of 2 blasts, starboarding her helm with each signal, according to Nelson. But whether the vessels were or were not end on, or nearly so, the ship was at fault on her own testimony for violating rule 3 of article 25, which directs that 'if when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle'; and she was also at fault for violating the inspectors' rule which provides that if, in the situation quoted from the statute, the vessels have approached within half a mile of each other, 'both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered and understood, or until the vessels have passed each other.'

"It is a perplexing problem to determine the facts of this collision from the two utterly discordant and irreconcilable accounts referred to above; but, if the place of collision be ascertained, we have a circumstance which should be decisive of other questions as to which there is a sharp conflict. Although Toresen testifies that the collision took place a quarter of a mile, or a little more, from the east shore, and Andersen a good quarter of a mile from that shore, Andersen himself, on his cross-examination, when asked whether the ship's wheel was shifted first one way and then another to hold his course, said, 'She went pretty steady because she was in the middle of the stream.' If the place of collision was in fact in or near mid-stream, and the yacht, when first sighted, was close in to the east shore, between a quarter and a half a mile inside of the ship, as Nelson alleges, she must have traveled diagonally across the river to reach the place of collision, and displayed her red light continuously to the ship. Nor could she have been any such distance to the east of the ship unless the ship was in or near mid-stream, or the yacht high and dry on the land. Miss Mosher testifies that it appeared to her that they were nearer to the east shore than to the west, both before the collision and when they weighed anchor later in the evening; but Miss Shand thought that they were going up near the middle of the river, as she says they had been doing all the way from New York. Miss Mosher said that at first the yacht seemed to be coming straight, and then volunteered a statement which raises a doubt as to the accuracy of her recollection or observation that the yacht was to the starboard of the ship. She said that, at the time the yacht seemed to draw towards the ship, 'it may have been because we moved over to the left a little after I thought we shifted.' Unless the yacht was on the ship's port hand, showing red, it is difficult to see how this movement of the ship could have brought the courses of the vessels closer together. The testimony of Hanigan and Rudd that the yacht was not traveling on the east side is corroborated by Tom Dumont, a cousin of libelant Dumont and master of a tug. He knew the yacht, and testifies that, when he was coming down the river with his tug and a tow of barges late in the afternoon of the day of the collision, the yacht overtook and passed him on his starboard hand, off Hook Mountain, between Rockland Lake and Tarrytown lights, and that at that time the tug was a little east of mid-channel, and the yacht very nearly in mid-river, going about 8 miles an hour. According to this, the yacht was then well on the westerly side of the deep-water channel; and the place where they passed is about 7 miles above the place of collision. Cochran, captain of the wrecking vessel Champion, which went to the scene two or three days after the collision, testifies that when he found the yacht she lay west of mid-stream from shore to shore, opposite the brewery dock, at a depth of about 50 feet at high water, according to his judgment, and this depth is confirmed by a diver who took soundings. The rise of the tide there is from $4\frac{1}{2}$ to 5 feet, and the chart soundings show a low-water depth of 45 feet opposite the brewery dock, a little west of the middle of the deep-water channel. He says he took ranges, and,

after making fast to the wreck, the flood tide, which sets in towards the east shore, shifted the wreck up the river about one-fourth of a mile, and carried it in so as to reduce the distance from the east shore about one-third. Christie, captain of the wrecking boat Reliance, which relieved the Champion and raised the wreck and took it ashore, says that when he took hold it lay somewhere near the middle of the river, favoring the east shore slightly, that in getting it up it moved 400 or 500 feet further in towards the east shore, and that the line he then ran to the shore was 1,500 to 2,000 feet long; the diver already referred to says 1,800 to 2,000 feet. Another diver, who went down to the wreck the day after it was located, judges that it lay about mid-channel. The ship's testimony is that she anchored in 6 fathoms, immediately after striking the yacht. This depth of water would be on the westerly side of the channel.

"I do not accept the ship's account of the collision, but regard it as inconsistent, contradictory, and improbable, and find that the collision took place on the westerly side of the deep-water channel, which extends from a little west of mid-stream to the easterly shore, or close thereto; and I also find that, although the yacht was not as far in towards the west shore as Hanigan and Rudd estimate, she was on the port hand of the ship coming straight down on the westerly side of the channel and showing her red light to the ship; that she continued on this course until danger of collision became imminent; that the ship, showing her red light to the yacht, was well in on the east side of the river when sighted by the yacht, and then worked over to the west side of the channel and ran the yacht down. As appears in the above abstract of the testimony, Nelson testifies on the reference that they starboarded when the second signal of two whistles was given by the ship, and on the inquest that they also starboarded when the first signal was given, and then 'kept steady except starboarding as the case required' up to the time of collision, and that they also starboarded to go astern of the schooner which had been wing-and-wing, but which changed her course to the east and was crossing the ship's bow and being overtaken by the ship. This last change of helm was made after the ship's second signal, Nelson states, although he adds that he 'could not say just how that worked.' I also find that the yacht twice gave a signal of one whistle to the ship, the first signal at or about the time stated by Hanigan, before there was any danger of collision, and the second after the schooner had crossed the ship's bow, and when the ship was 500 or 600 feet away, had suddenly opened up her green light, and was headed for the yacht; that the yacht ported on giving her second signal; that the ship answered this second signal of the yacht with two blasts; and that the yacht immediately gave danger signals and reversed. It may be, as libelants' counsel suggests, that the small yacht was not seen until the ship had gone out to mid-stream to keep clear of the various sailing vessels which, as hereinbefore shown, her crew testify were ahead, and then, in a moment of indecision and alarm, her helm was starboarded instead of being ported. It will be seen by reference to the testimony of Nelson, set forth above, that, although he testifies that the yacht was from 1 to 1½ miles away when he sighted and first signaled her, he at one time states in effect that she was about one-quarter of a mile away. Miss Mosher says that the interval between the ship's first signal and the collision was about 3 minutes; and Miss Shand, as appears above, testifies that just before the ship's second signal Nelson gave an order, and the ship kept going to the left. But whether the suggestion made by libelants' counsel is or is not well founded, I find that, the vessels being red to red, the ship, if she actually gave two signals of two blasts each to the yacht, was at fault (1) for attempting to pass to the left under a two-blast signal without having obtained the assent of the yacht, (2) for not keeping to her own starboard side of the channel, (3) for not sounding alarm signals, but keeping on at full speed and repeating her two blasts when her first signal was not answered, (4) for crossing the one-blast signal of the yacht, (5) for not stopping and reversing when danger of collision should have been obvious, and (6) for not maintaining a competent and sufficient lookout. Because of his youth and limited experience, I do not consider that Hernsen was a competent lookout.

"Most of the allegations of fault which the answers make against the yacht have been disposed of adversely to the ship, such as the charge of intoxication

on the part of the crew, of excessive speed, of proceeding down on the wrong side of the river, of porting the helm to head across the course of the ship when on the ship's starboard bow, and of not stopping and reversing prior to the collision. Other charges are that the yacht was not properly manned and equipped, did not maintain a good and sufficient lookout, and did not respond to the two-blast signals of the ship. As to the first two of these charges, the men engaged in navigating the yacht were sufficient for the purpose, and, although Rudd and Hanigan lacked experience on steam vessels, this contributed in no respect to the collision under the facts found above. The captain himself, and Hanigan, the lookout, sighted the ship when she was a long distance away, and watched her up to the time of the collision. The yacht was a small vessel, and Hanigan's position by the pilot house was but a short distance from the bow. As to the charge that the yacht did not answer the ship's signals, she did answer the second by blowing alarms and reversing, and this was proper under the circumstances; and, if the first was given, it was when the vessels were about a mile apart, according to the ship's claim. Libelants argue that, assuming the signal was given, it is probable that it was overlapped by the yacht's first signal. The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519. But whether that was so or not, the signal being given when the vessels were a mile apart and when there was apparently no danger of collision, the yacht would have been justified in disregarding it and presuming that the ship would comply with the rules, even if she had heard it. The Victory, supra. On the facts as I have found them, the fault of the ship was so conspicuous that proof of fault on the part of the yacht should be clear and convincing to make a case of mutual fault, and all doubts as to the management of the yacht or her contributory negligence should be resolved in her favor. The Victory, and cases there cited, page 423 of 168 U. S., 18 Sup. Ct. 149, 42 L. Ed. 519.

### "Damages.

"1. The yacht was a wooden vessel, and had been last inspected June 26, 1905, when a certificate was issued by the steamboat inspectors at New Haven, permitting her to navigate Long Island Sound, the bay and harbor of New York, and tributary waters. Her license of July 6, 1905, issued at New York, gives her dimensions as 44 feet length, 10.7 feet breadth, and 5.2 feet depth, and her tonnage is stated to be 13 gross, 8 net. The license also shows that she was built at Middletown, Conn., in 1889. Her owner testified that she had always passed inspection since he bought her in 1899, when he traded an alcovapor launch for her and paid $1,000 in addition. He said that he had paid $1,400 for the launch when it was about six months old, had run it two seasons, and valued it at $1,300 at the time he bought the yacht. He testified to quite extensive repairs, renewals, and alterations to the yacht after his purchase, and additions made to her equipment, including the overhauling of her machinery at an expense of $1,000; and he stated that when he had completed this work she had cost him about $5,000. He produced many bills for work done to her, covering the period of his ownership, and said that her condition was first class, and in his judgment she was worth $4,000 at the time of the collision. In his charter to Rudd, the latter was given an option to purchase at $3,000, but in explanation of this the owner stated that his family had gone to Europe that summer, he had no use for the yacht, wished to save the expense of carrying her through the summer, and also needed the money. His experience with vessels was quite limited. It appears that in the spring he had tried to sell the yacht through brokers for $2,800 or $3,000, but received no offers, and had also tried to sell her in 1900, although he could not remember his asking price at that time. Tom Dumont testifies that he had charge of putting her in commission in 1902, as much as $1,000 was spend on her, and she was then sound and in first-class condition. He estimated her value at $4,000 or $5,000 at the time of her loss, assuming she had been kept in good condition in the meantime, and said that it would cost $9,000 to replace her in 1905. Carll, who has a shipyard at Northport, Long Island, did work on the yacht from time to time, and testified that he partly rebuilt her the first and second seasons Dumont had her; that she was made practically new above water, and it appeared to him that a new bottom had been put in

181 F.—42

her before he did any work. He considered her worth from $4,500 to $5,000, and said it would cost $5,000 or more to build a new hull like hers. The owner claims $4,000 for the loss of the yacht, but I do not think she was worth that amount. His offer to sell to Rudd for $3,000, and the fact that he had previously put her on the market for $2,800 to $3,000 without success, would indicate that she was not worth more than $2,800. She was 16 years old, and a yacht of that age must have suffered a heavy decline in value. I think that $2,500 would fairly compensate libelant Dumont for the loss of the yacht.

"2. Gracie was 31 years old at the time of his death, and left a wife, Eugenie, 36 years old, to whom he had been married about 4 years, and one child, Etta Eugenie, about 3 months old. This child was alive at the time the wife testified in March, 1907. The wife describes her husband as 6 feet 2 inches in height, weighing from 150 to 160 pounds, enjoying perfect health, and never indulging in liquor. He at times worked as a stationary engineer, but was generally employed on steam yachts. He was chief engineer on Mr. Edwin Gould's yacht for three years, and left that employment only when the yacht was sold, and subsequently he went to Europe as engineer on another steam yacht. Mrs. Gracie testifies that her husband never had difficulty in getting a position, and had taken correspondence courses in marine, stationary, and locomotive engineering, at the time of his death was studying to fit himself to take charge of a power house, and was also working on some devices he expected to have patented. Her testimony is that he was a good, kind husband, never earned less than $100 a month, and in addition received tips from his employers amounting to from $40 to $50 a month for making good speed; and as his board, lodging, and clothes were furnished him, he needed little money, and turned over to her from $100 to $125 a month. He was her sole support, she says, and since his death she has lived on money saved during his lifetime, and her earnings as a seamstress. Libelant's counsel maintains that an award of $25,000 should be made, basing his argument mainly on Gracie's expectations of life as shown by the mortality and annuity tables, in connection with the sums which the wife testifies he was in the habit of turning over to her. The deceased was apparently a man of intelligence, enterprise, and ambition, and these are circumstances which should not be overlooked in determining the value of his life to his wife and next of kin. But the interest alone on the amount claimed would exceed his annual earnings at the time of his death. There would seem to be some exaggeration in the wife's testimony as to the sums she received, in view of his earnings; but his earnings may be assumed to have been $100 a month, and, considering his qualities, it is not improbable that this would have been increased; and it is clear that he provided liberally for his wife in proportion to his means. But his physical strength and earning capacity would have declined with years, even if he had met with no accidents, and it is probable that he or his wife or the child would have died before the expiration of his or her mortality period. To base the award on the mortality tables, regardless of the many vicissitudes of life, would, to quote the language of Judge Simonton in The William Branfoot, 48 Fed. 914, 'be securing for libelant compensation for a certain period when we are dealing with the most uncertain thing in the world—human life.' In Cheatham v. Red River Line, 56 Fed. 248, the court, in discussing this subject, remarked that it is 'purely problematic how long the most productive life will continue so,' and added:

" 'The fluctuations in business, and its opportunities; the liability to form bad habits; the development of disease which, without ending life, may make its possessor incapable of earning money; the uncertainty which there must be as to the continuance of physical capacity; and the mental and moral purposes requisite for the earning of wages, as well as that as to the existence and continuance of the necessary external conditions—all these elements make the problem of how long a man's productive life shall be estimated to be one of the greatest uncertainty. There are no tables of productive lives. It is human experience that some lives are almost worthless to those dependent upon them, and some which are, and which promise to be, support and comfort, come to produce nothing but shame and sorrow. In fixing the value of a human life, and in trying to be just alike to the injured and the injurer, no

chimerical estimate should be made, but rather should there be a resort to sober judgment.'

"In that case deceased was a deck hand on a steamboat, was 38 years old, and left 3 children, but no wife; the children being 5 and 2½ years, and 6 months old, respectively. The court allowed $2,500, stating that it gave great weight to the fact that the amount of recovery was limited to $5,000 in many of the states, and by the only act of Congress allowing a recovery in such cases. This case was decided in 1893, and since then these limitations have been quite generally repealed, and the tendency has been towards much larger awards. In MacMahon v. Brooklyn, etc., Ferry Co., 10 App. Div. 376, 41 N. Y. Supp. 1026, the deceased was 34, earning from $1,800 to $1,900 a year, and left a wife and 2 children, 10 and 8 years of age, respectively. All of these facts do not appear in the report of the case, but have been ascertained from an examination of the record. The jury gave a verdict for $21,000, and the court affirmed the judgment, observing in regard to the amount: 'The verdict was quite large in amount, but in view of the age, character, habits, and business capacity of the deceased as they appeared by the evidence to have been, of the age of his children, and of the income derived from his services and business occupation, it cannot well be seen that the damages were excessive or more than the jury were warranted in finding that his widow and next of kin, who were dependent upon him for their support and education, had sustained pecuniarily by the death of the plaintiff's intestate.' In Schmitt v. Met. Life Ins. Co., 13 App. Div. 120, 43 N. Y. Supp. 318, the deceased was a foreman of a gang of men engaged in repairing an elevator shaft when he was killed. It does not appear from the report how old he was, what his earnings were, or what family he left. The jury gave a verdict for $25,000, which the court reduced to $15,000, stating that this would 'really represent the maximum measure of damages.' In Beecher v. L. I. R. R., 53 App. Div. 324, 65 N. Y. Supp. 642, the deceased was a telegraph operator and collector of stock news, was 61 years old at the time of his death, earned $1,070 a year, and left a wife but no children. There was a verdict for $10,000, which the court regarded as liberal, but not excessive. In Reilly v. Brooklyn Heights R. R., 65 App. Div. 453, 72 N. Y. Supp. 1080, the deceased was a coachman 36 years old, and left a wife and seven children. The court refused to set aside as excessive a verdict for $15,000. In Hock v. N. Y. & Queens Co. Ry., 74 App. Div. 52, 77 N. Y. Supp. 200, the deceased was 34, and left a wife and four children, for whose support he had been contributing $20 a week besides paying the rent. There was a verdict for $15,000. The court affirmed the judgment without comment on the amount. In Lane v. Brooklyn Heights R. R., 85 App. Div. 85, 82 N. Y. Supp. 1057, the court said that a verdict of $25,000 was large, but not excessive, where the deceased, a chief of battalion in the fire department, was 38 years old, left a wife and two children, aged 8 and 12, and had been receiving a salary of $3,300. In Coolidge v. City of New York, 99 App. Div. 175, 90 N. Y. Supp. 1078, where there was a verdict for $22,000 which the court reduced to $15,000, the deceased was 37 years old and left a wife and four children, the oldest 4½ years and the youngest a few months. The wife testified that her husband gave her from $20 to $25 a week for the support of herself and children. In Hoffman v. N. Y. Cent. R. R., 42 Misc. Rep. 579, 87 N. Y. Supp. 617, the court at Trial Term reduced to $12,000 a verdict for $18,000 where the deceased was a driver of a brewery wagon, earned $720 a year, and left a widow and three children, the oldest of whom was 12 years. In The Saginaw and The Hamilton, 139 Fed. 906, Judge Adams reduced to $6,000 an allowance of $7,500 made by a commissioner where the deceased was chief officer of a steamship, was 60 years old, and earned $67 a month with board. The reduction was made 'in view of the decedent's age and limited earning capacity.' In affirming the decree, the Circuit Court of Appeals considered this and other awards to be 'fair and conservative.' 146 Fed. 724, 77 C. C. A. 150. I think that $12,000 would be a proper award to the administratrix of Gracie, considering his age, the amount he earned, his qualities, and prospects. This is not excessive in comparison with the award last cited, and is moderate when compared with the recoveries sanctioned by the Appellate Division of the New York Supreme Court.

"3. The parties stipulated that in' the event of my finding that there was a liability on the part of the claimants of the ship or of the Higginson Company, or both, for the death of Miss Dodge, I should award as damages the sum of $2,250. I therefore find that the administratrix of Miss Dodge is entitled to recover $2,250.

"4. Hanigan testifies that, while it was difficult to say how long he was in the water, he judges that he was swimming from three-quarters of an hour to an hour before he was picked up. He states that he had a life preserver, but gave it up to Green. There were no serious results from his experience. He says that the only inquiry he received was a blow from some object in the water, and this made his side 'all blue,' and he could hardly walk the next day, was nervous, and consulted a doctor. I think that $100 would be a sufficient allowance for this part of his claim, with $5 paid to the doctor. He also testifies to lost property, says that he was expecting to spend the summer on the yacht, and had a trunk aboard filled with wearing apparel and personal articles. The principal things he mentioned are two diamond rings, one with two stones, on which he put a value of $70, and the other with one stone, which he valued at $50. The two-stone ring he says he bought of a young man whose name he gives, and who lived in Cheyenne and wanted to raise money to pay his expenses back, and asked $90 for the ring. He states that he bought the ring for $70 to assist his friend, without having had it valued. The other ring was a present from his mother, and he says that people he showed it to told him it was worth $50, and a railroad station agent once offered him that amount for it. So far as appears, neither ring was ever submitted to a jeweler for appraisal. He also mentions a gold watch, Elgin make, open face, which he bought two years before for $35 from a man who said it was new; also a gold fob chain, which he says he acquired in about the same way, and which had a gold yacht-club pin on it bought by him of a jeweler in Yonkers. He put a value of $25 on this chain and pin. The testimony as to the values of these articles is unsatisfactory. The value of a diamond is a matter peculiarly within the knowledge of an expert, and depends upon its kind, size, and quality, and Hanigan furnishes no particulars on these points. It would be mere guesswork to give a value to the rings upon his testimony. The testimony as to the value of the watch and chain is not much better, but as most people have some idea, more or less accurate, as to the value of such articles, I allow $25 for both, since the probability is they were worth at least that amount. He also testifies as to three suits of clothes which had been made for him, one a month, another one and one-half months, and the third two months before, costing $35, $30, and $25, not much worn. I allow $75 for these, $22 for a new waterproof coat, $15 for shirts, collars, cuffs, and underwear, $5 for shoes, $5 for a new pair of rubber hip boots, and $2.50 for a new suit of oil skins. He also claims for a silk umbrella with a silver-headed stick, which he says was a present from his father two years before, and which his father told him was worth $15. There is nothing to explain this large value for an umbrella. I allow $2.50 for it. He says that he also lost a set of books of the International Correspondence School, 14 volumes, covering courses he had taken in chemistry, electric engineering, and mechanical engineering. He states that he had finished these courses, and the books had been paid for one at a time as he received them. He does not remember what he paid for the instruction, and at one time says that he cannot tell what he paid for the books, and at another time that they cost at least $50. I allow him $25 for these books, in the absence of more definite testimony as to what they were, what they cost, and their condition. The foregoing sums allowed him aggregate $282.

"5. The owners of the ship maintain that, if the ship was at fault, the liability for any damages arising therefrom should rest upon the Higginson Company, on the ground that, because Nelson was not a pilot imposed by law, he was the agent of the Higginson Company by virtue of the terms of the charter. On the other hand, the Higginson Company contends that the charter created no liability on its part for the negligent navigation of Nelson, citing Bramble v. Culmer, 78 Fed. 497, 24 C. C. A. 182, and Hammond v. The Hathor, reported in the Law Journal of October 16, 1908. The latter was a case of compulsory pilotage, and I do not regard it as applicable; but in the

former case the court, after reviewing a number of authorities, said: 'No case has been cited, and our researches have not disclosed any, where the mere appointment of a pilot has been held to operate so as to change legal ownership and responsibility. The pilot is considered as the servant or agent of the owner. The fact that he was selected and paid by the charterers cannot alter his relations to the ship.' The action there was by the owners against the charterers for the loss of the vessel while being piloted by a pilot selected and paid by the charterers. But the agreement between the owners and the charterers was merely that the charterers should pay for the pilotage, not that they should provide the pilot, and the owners were at liberty to take him or not, as they chose, 'and in taking him he became their servant,' the court held. The provision in the charter upon which the owners base their contention in the present case is the stipulation that 'the charterers shall provide and pay for all * * * pilotages.' Judge Holt has recently held, in The Prince Line v. Munson Steamship Line (D. C.) 166 Fed. 139, where the action was also by the owners against the charterer, and the charter was substantially the same as in this case, and the provision as to pilotage identical, that this provision did not make a pilot appointed and paid by the charterer the agent of the charterer, adding: 'The acts of the pilot were acts of navigation. The owners were responsible for the entire navigation of the ship'—citing, among other cases, Bramble v. Culmer. If this is the effect of the provision as between the parties to the charter, the owners are certainly liable as to third parties.

"Aside from this, the maintenance of a competent and sufficient lookout was a duty that would rest upon the owners, even if Nelson was the agent of the Higginson Company, and I have found that this duty was not performed. And, in any event, the owners, as claimants of the ship, are liable in the action of Dumont, which is in rem. The circumstances here are different from those in the case before Judge Holt. Here the action is by third persons against both owners and charterer. There a tug was employed by the charterer to take the ship from a pier in the East River into Newtown creek, and the captain of the tug was aboard the ship, acting as pilot, when the ship grounded. Here Nelson was employed by the charterer at a salary which covered his services not only as a pilot in Nova Scotia waters, over Nantucket Shoals, through the Sound, and through the Hudson River, but as supercargo, apparently for the term of the charter; at any rate, this was his fifth trip. The captain put him on the ship's articles as coast pilot and supercargo; but, if the owners had been dissatisfied with the way he performed his services, they could not have removed him, the Higginson Company alone having the power to do that. It was because the captain and the other officers did not have the requisite knowledge to navigate in certain waters that the Higginson Company assumed and attempted to perform the obligation of supplying a person who should do this navigation. And if, through its employé, it performed this service in such a way as to damage other vessels and third persons through negligence, I fail to see why an action cannot be maintained against it for such negligence. At the request and for the convenience of the Higginson Company the captain left the ship at New York, and Nelson was thereby deprived of the assistance and counsel of the captain. The chief and the other officers were under Nelson's command, and he was to every intent and purpose the master of the ship. I do not see that the situation was at all different from what it would have been if the charter had in express terms stipulated that the owners' appointed master should withdraw, and the charterer take command of the ship by a master of its own appointment, while she was navigating the Hudson river. According to the chief officer, Nelson disregarded suggestions of his which, if adopted, might have prevented the collision. If Nelson had injured a third person while acting in his capacity as supercargo, the Higginson Company as his employer would have been liable, and I do not see why it should not be equally liable for his injuries to third persons while he was acting as pilot, whatever the legal situation might be as between the owners and the Higginson Company. There can be no question that Nelson would be personally liable for his negligence resulting in a collision with another vessel, and under the doctrine of respondeat superior it would seem that

his employer should also be liable. I therefore think that both the owners and the charterer are liable for the damages hereinbefore mentioned.

"I therefore find as follows:

"1. In the action of Charles W. Dumont, the libelant is entitled to a decree against the steamship Volund and her claimants, and against the Higginson Manufacturing Company, for the sum of $2,500, with interest from July 11, 1905.

"2. In the action of Eugenie Gracie, as administratrix, etc., the libelant is entitled to a decree against all the respondents for the sum of $12,000, with interest from July 11, 1905.

"3. In the action of Eliza S. Dodge, as administratrix, etc., the libelant is entitled to a decree against all the respondents for the sum of $2,250, with interest from July 11, 1905.

"4. In the action of Joseph H. Hanigan, the libelant is entitled to a decree against all the respondents for $282, with interest from July 11, 1905.

"All of which is respectfully submitted."

The following is the opinion of Adams, District Judge, in the court below:

"These actions arose out of a collision of the steamship Volund and the steam yacht Normandie, which took place in the Hudson river about 8:30 p. m., July 11, 1905, between Dobbs Ferry and Irvington. The yacht was sunk and became a total loss. Three of the persons on the yacht were drowned, William A. Storms, her master, Stewart Gracie, her engineer, and Gladys Dodge, a guest on board. The first of these actions was brought by Charles W. Dumont, the owner of the yacht, the second by the administratrix of Stewart Gracie, the engineer; the third by the administratrix of Miss Dodge; and the last by Joseph M. Hanigan, deck hand of the yacht—for personal injuries and loss of personal effects. By petition of A. and O. Irgens, the owners of the Volund, the Higginson Manufacturing Company, the charterers of the Volund, was brought into all of the actions. An action on behalf of Storms, the master of the yacht, was brought but has not been pressed for trial and is therefore not included. The four actions which are included here were referred to Herbert Green, Esq. After hearing the testimony, he reported in favor of the yacht on the merits of the collision, allowing $2,500, with interest, for her loss, recoverable against the Volund and her claimants and against the charterer; in favor of the administratrix of Gracie, for $12,000 with interest, against all the respondents; in favor of the administratrix of Miss Dodge for $2,250, with interest, against all of the respondents; and in favor of Hanigan against all of the respondents for $282, with interest. He also reported, in conformity with a stipulation, that the damages for the death of Miss Dodge were $2,250.

"The libelants, except the administratrix of Miss Dodge, and all of the respondents have excepted to the report, and the matter is now before me to pass upon its correctness. Before proceeding to the consideration of the exceptions, it is proper I should say that my recent decision in the case of Luckenbach v. Delaware, Lackawanna & Western Railroad Company, decided March 25th last (168 Fed. 560), has no bearing upon this case, as has been suggested. I held there that the court had no supervisory powers over the report of a commissioner to whom the case had been referred 'to hear and determine the issues in dispute, raised by the libel and answer.' Here the reference was to the commissioner, 'with instructions to hear the testimony of the parties and to report his conclusions on the issues of law and fact.' The distinction is obvious. In the one the commissioner was to hear and determine the issues, and in the other he was to hear the testimony and to report his conclusions to this court. No final determination of the issues, as far as this court was concerned, was contemplated here by the order of reference, and the whole matter remains in the control of the court.

"The libelant Dumont filed an exception to the report: That the allowance of $2,500 for the loss of the yacht is insufficient.

"The commissioner said in this connection: (Extract A Commissioner's Report, pp. 34–36.)

"This statement amply explains and justifies the award. The administratrix of Gracie excepts to the allowance of $12,000 for his death.

"The commissioner said in this connection: (Extract B Commissioner's Report, pp. 36–40.)

"He gives full reasons for his award, and they seem to be sound.

"Hanigan excepts to the allowance of $282 to him.

"The commissioner said in this connection: (Extract C Commissioner's Report, pp. 41–43.)

"The explanation seems to be reasonable.

"The owners of the Volund except in detail to (a) all alowances against her and because the commissioner did not find her wholly free from fault; (b) that he assessed the damages on account of the death of Gracie at the sum of $12,000, and in that, if the libelant was entitled to recover at all, he assessed them at any sum in excess of $5,000; (c) that, if there was any liability on the part of the Volund, he did not hold the Higginson Company alone for it.

"(a) With respect to the merits of the collision, the principal dispute was whether the Volund or the yacht was navigated on the wrong side of the channel; each charging the other with fault in this respect.

"The testimony is voluminous and directly in conflict in many important particulars. The solution of the controversy depends very largely, if not entirely, upon the credit to be given to the statements of the witnesses. There is evidence to support both sides of the dispute, and, in view of the great advantage the commissioner had in that all of the witnesses testified before him, I should hesitate to disturb his conclusions, even if I thought that different ones should be reached. I do not so think, however, but I consider it more probable that his results are sound and just.

"(b) If I were disposed to alter the finding with respect to the damages in this regard, it would be to increase them. I think, however, that the report should stand as it is.

"(c) With regard to the respective liability of the vessel or the charter, the commissioner has reported as follows: (Extract D Commissioner's Report, pp. 43–46.)

"The Higginson Company has also excepted in detail to the commissioner's report with respect to the collision; that he did not find the Volund and her owners solely liable; that he found the pilot Nelson negligent and charged the Higginson Company therewith. It then proceeds to except to the findings with respect to the allowances for the deaths and personal injuries.

"With respect to Nelson it appears that he was on board as supercargo and pilot, paid by the charterer. He had had considerable sea experience and had navigated the river several times, but had no license of any kind for local waters, although he had an English certificate, also one from the American Shipmasters' Association. On this occasion he was acting as pilot of the Volund and was in charge of her navigation. In his lengthy examination his testimony was very contradictory and confused. He was no doubt largely responsible for the faults of his vessel in this collision. Being the agent of the charterer, it should be held for his negligence. The commissioner's conclusion with respect to the Higginson Company's liability was correct.

"The other matters have been considered in the treatment of the exceptions of the Volund and need not be repeated.

"The commissioner's findings seem to be correct.

"All of the exceptions are overruled, and the report is confirmed."

This controversy comes here upon appeals from four decrees of the District Court, Southern District of New York. It arose out of a collision between the Norwegian steamship Volund and the steam yacht Normandie in the Hudson river off Dobb's Ferry about 8:30 p. m. on July 11, 1905. The steamer was bound from Nova Scotia to Newburg, N. Y., with plaster; the Normandie was bound down the river to land a pleasure party at Yonkers. The steamer practically cut the yacht in two and she sank at once. Her master and engineer and one of her passengers were drowned. Libels were filed by the **owner of the yacht, by the personal representatives of the engineer and of**

the passenger who were drowned, and by the deck hand of the Normandie for personal injuries and loss of personal effects. Issues being joined, each cause was by consent of parties referred to Herbert Green, Esq., as commissioner to hear the testimony and report his conclusions upon the issues of law and fact. He found the yacht free from fault and that the steamer was improperly navigated. The Volund being under charter at the time of the collision, her owners brought in the charterer on petition, and the master held both the owners and the charterer liable for all the damages.

Exceptions were duly filed to the commissioner's report. They were all overruled by the district judge and the four decrees duly entered. Both the shipowners and the charterer are appealing on the ground that the Normandie and not the Volund should have been held responsible for the collision. They are also appealing as against each other on the ground that, even were libelants entitled to the awards given them by the District Court, the burden of paying these awards was not correctly apportioned by the District Court. The shipowners contend that, if the collision were in any' event due to the fault of the Volund, the fault in question was solely that of pilot Nelson in starboarding the steamer's helm and not in the lookout which was kept by the crew of the Volund other than pilot Nelson. The charterer contends, on the other hand, that Nelson, although appointed by it, became, as a matter of law, the servant of the shipowners for the purpose of navigation of the Volund, and that for any negligence of Nelson the shipowners, and not the charterer, ought to be held liable.

Wallace, Butler & Brown (F. M. Brown, of counsel), for shipowners.

Avery F. Cushman, for cargo owners.

Convers & Kirlin (J. Parker Kirlin, of counsel), for appellees.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). All the testimony as to the collision was taken before the commissioner. He has most carefully epitomized the statements of the different witnesses and discussed in great detail the various problems presented for solution. It is unnecessary to repeat here even a summary of the transactions. He found the steamer at fault (1) for attempting to pass to the left under a two-blast signal without having obtained the assent of the yacht, (2) for not keeping to her own starboard side of the channel, (3) for not sounding alarm signals, but keeping on at full speed and repeating her two blasts when her first signal was not answered, (4) for crossing the one-blast signal of the yacht, (5) for not stopping and reversing when danger of collision should have been obvious, and (6) for not maintaining a competent and sufficient lookout. The district judge says:

"The testimony is voluminous and directly in conflict in many important particulars. The solution of the controversy depends very largely, if not entirely, upon the credit to be given to the statements of the witnesses. There is evidence to support both sides of the dispute, and, in view of the great advantage the commissioner had in that all of the witnesses testified before him, I should hesitate to disturb his conclusions, even if I thought that different ones should be reached. I do not so think, however, but I consider it more probable that his results are sound and just."

We fully concur in this conclusion. The only subject left to be discussed is the controversy between shipowners and charterer as to their respective liabilities.

The Volund at the time of the collision was under a time charter to the Higginson Manufacturing Company of Newburgh, which provided that:

"The said owners agree to let and the said charterers agree to hire the said steamship from the time of delivery for the period of six months, steamer to be placed at the disposal of the charterers at Windsor, Nova Scotia, to be employed in carrying lawful merchandise, between safe port or ports, as the charterers or their agents shall direct and on the following conditions."

The form of charter is a familiar one, and the following clauses may be quoted:

"(1) The owner shall provide and pay for all provisions, wages and consular, shipping and discharging fees of the captain, officers, engineers, firemen and crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine room and other necessary stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

"(2) That the charterers shall provide and pay for all coals, fuel, port charges, pilotages, agencies, commission, consular charges (except those pertaining to the captain, officers or crew) and all other charges whatsoever, except those before stated."

"(10) That the captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew, tackle and boats. That the captain (although appointed by the owners) shall be under the orders and direction of the charterers as regards employment, agency or other arrangements; and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or otherwise complying with the same."

"(11) That if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers or engineers, the owners shall, on receiving particulars of the complaint, investigate the same, and if necessary make a change in the appointments.

"(12) That the charterers shall have permission to appoint a supercargo, who shall accompany the steamer and see that voyages are prosecuted with the utmost despatch"

Counsel also refer to the clauses which provide that hire shall commence on the day of delivery and continue until day of redelivery; that for nonpayment of hire the owners may withdraw the steamer from service of the charterers; that cargo be laden and discharged at any dock, wharf, or place that charterers may direct; that the whole reach of the vessel's holds, decks, etc., reserving only proper and sufficient space for ship's officers, crew, etc., shall be at the disposal of charterer; that all steam winches shall be at charterer's disposal during loading and discharge, and steamer to provide men to work the same; that derelicts and salvage shall be for owner's and charterer's equal benefit. Clauses 4, 6, 7, 8, 9, 23, and 24.

Under clause 12 the charterer appointed as supercargo one Capt. Nelson, who held a master's certificate for seagoing steam vessels issued by the Province of Nova Scotia. He testified that he had followed the sea since he was 11 years old, had been "around here" 25 or 30 years, and was a member of the American Shipmasters' Association before getting the Nova Scotia certificate; that he had been up the Hudson a great many times and was familiar with it. He had made the same voyage with the ship, from Nova Scotia to Newburg and return, on four previous occasions under the charter. He said he supposed he was put on the ship as pilot and supercargo, and that

he piloted her over Nantucket Shoals and the Sound and the Hudson river. The ship's captain, Lassen, was not on board, having landed at the Battery along with the Hell Gate pilot who had charge of the navigation down the East River. The captain's object in going ashore was to enter the ship at the Custom House and save time; he intended to rejoin her at Newburg. Capt. Nelson was on the bridge and navigated the Volund from New York until collision.

The owners found their contention that the charterers are liable—

"(1) upon the proposition that any pilot other than the one imposed by law became the charterer's agent by virtue of its express agreement, which made the piloting of the steamer in pilotage waters its work, and (2) upon the proposition that, irrespective of the charter party, Capt. Nelson was an ordinary servant employed by the Higginson Company and acting within the scope of his employment, and that said company was therefore liable for his acts."

In two recent cases we have had a similar charter before us and held that it did not amount to a demise of the vessel, and that consequently the navigation of the ship during the time of the charter is in the hands of the owner. The Santona, 169 Fed. 275, 94 C. C. A. 551; Dunlop S. S. Co. v. Tweedie Trading Co. (C. C. A., April 18, 1910) 178 Fed. 673. Since the navigation remains in the hands of the owner, all instrumentalities (human or other) which he uses to conduct it are his own while thus employed, no matter from what source he obtains them. We have no question here as to navigation in waters where the law compels the employment of some local pilot. For the consequences which may result from the failure of any of these instrumentalities properly to do the work the owner who is employing them may be liable; he cannot escape liability for damages done by his vessel in consequence of her being improperly navigated because the person in fault was temporarily assigned by some one else to assist him in doing the work which was distinctively his own. Nor can we assent to the proposition, which is earnestly contended for, that under charter parties of this sort there is some joint, two-headed navigation of the vessel which will put both parties in control. The provisions (clauses 8, 10) that the captain shall be under the orders and direction of the charterers as regards employment and other arrangements merely authorize the charterer to designate the safe port, and the berth therein to which the ship shall proceed. How she shall be navigated to get there is a matter entirely within the owner's hands. Nor are we persuaded to the conclusion that the phrase "charterer shall provide and pay for pilotages" entitles him to insist that the vessel shall be navigated in pilotage waters by an individual of his own selection, although in the best judgment of the master some other person should be intrusted with that operation. We must not be understood as deciding more than the case now before us. If upon arrival in some foreign country, with which the master is unfamiliar, he should request the charterer's agent to secure him a local pilot, and the agent should refuse to do so, or if the agent should assign him some pilot known to the agent to be incompetent, or whose personal habits were known to be such as to make him an unsafe person to be intrusted with responsibility, questions might arise which would have to be determined when presented. In this case there is nothing to indicate that

Capt. Nelson was incompetent or unfit to act as a pilot up the Hudson river. The happening of this collision does not establish any such proposition. Many competent and proper navigators have at times committed faults in handling their vessels.

Nor are we persuaded that, although the Higginson Company selected Nelson as its supercargo and paid his salary, it remained his responsible employer when he was engaged in the operation of navigating the vessel for the shipowners, especially since, as we construe the charter, the master need not have allowed him to conduct the navigation unless he was satisfied to intrust it to him, and if dissatisfied could have removed him. The Slingsby, 120 Fed. 753, 57 C. C. A. 52. We find no error in assessment of damages.

We do not think the award of $12,000 as damages for the loss of life of the engineer, Gracie, was excessive. He was 31 years old, in perfect health, and never indulged in liquor. He was earning from $1,300 to $1,500 a year and left a wife and child.

We find no error in allowing the taxation of the premiums on libelant's stipulations for costs. It was quite proper to present their claims in the admiralty court, and the present custom of obtaining security from some insurance company instead of from personal friends is too well settled to be disturbed.

The decrees should be so modified as to hold the Volund solely in fault for the collision, with half costs of appeal to the libelants against the Volund and interest. Causes remanded to the District Court for appropriate action.