The **PEOPLE OF the STATE OF CALIFORNIA, acting By and Through the DEPARTMENT OF TRANSPORTATION, Plaintiff,**

v.

The **S/T NORFOLK, her furniture, tackle, apparel, etc. Norfolk Navigation, Limited, Leo Wuesthoff, Captain Paterakis, Phillips Petroleum Corporation, Defendants.**

**No. C75–0152 WTB.**

United States District Court,
N. D. California.

June 16, 1977.

Harry S. Fenton, Chief Counsel, Robert F. Carlson, Asst. Chief Counsel, Richard A. Wehe, James E. Livesey, Sacramento, Cal., for plaintiff Dept. of Transp.

John R. Pascoe, Hancock, Rothert & Bunshoft, San Francisco, Cal., for plaintiff State of California.

Lillick, McHose & Charles, Graydon S. Staring, John W. Ford, Edward M. Keech, San Francisco, Cal., for defendant Norfolk Navigation, Ltd.

Stanley J. Cook, Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for defendant Phillips Petroleum.

## OPINION

BEEKS,* District Judge:

On the morning of January 22, 1975 S/T NORFOLK, fully laden with 33,500 tons of crude oil, prepared to dock at Amorco Wharf on the Sacramento River a few miles inland from San Francisco Bay. As she maneuvered off the dock, a sudden shift in the current caught her stern causing it to swing around out of control until it contacted the Benecia/Martinez Highway Bridge damaging the protective fender system around one of its piers. It is in respect of such damage that the State of California filed this suit against the vessel, her owner and her time charterer. *In personam* defendants have filed cross-claims seeking indemnity or contribution. Trial was had solely on the issue of liability. The Court makes the following narrative findings reflecting the greater weight of credible evidence.

## FACTS

NORFOLK is a single-screw steam tanker owned by Norfolk Navigation Limited ("Norfolk") of 15,000 horsepower, 34,682 deadweight tons, 669.5 feet length and 87.5 feet breadth. Her draft on this occasion was 36 feet 6 inches aft and 35 feet 6 inches forward. She was under time charter to Phillips Petroleum Company ("Phillips"), the owner of the Amorco facility where her cargo was to be discharged. Relevant provisions of the time charter include:

. . . . .

3. . . .

Charterers shall exercise due diligence to ensure that the vessel is only employed between and at safe ports, places, berths, docks, anchorages and submarine lines where she can always lie safely afloat, but notwithstanding anything contained in this or any other clause of this charter, Charterers shall not be deemed to warrant the safety of any port, place, berth, dock, anchorage or submarine line and shall be under no liability in respect thereof except for loss, or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged in any dock or at any wharf or place or anchorage or submarine line or alongside lighters or other vessels as Charterers may direct.

. . . . .

---

* The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation.

5. Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in clauses 34 and 35 hereof, to pay for all insurance on the vessel, for all deck, cabin and engineroom stores, and water, except water for the boilers which (unless the vessel is off-hire) is to be supplied and paid for by Charterers; and for all fumigation expenses and deratisation exemption certificates. . . .

6. Charterers shall provide and pay for all fuel (except galley fuel), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with the preceding clause hereof, provided that all charges for the said items shall be paid by Owners when incurred for Owners' purposes, whether the vessel is on hire or off-hire.

. . .

10. The master shall prosecute his voyages with the utmost despatch and shall render all reasonable assistance with the vessel's officers and crew and equipment, overtime pay of the master, officers and crew in accordance with ship's articles being at Charterers' expense when incurred as a result of complying with the request of Charterers or their agents.

. . .

13. . . .

Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master, who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents, against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores who although employed by Charterers shall be deemed to be the servants and in the service of owners and under their instructions.*

* but such indemnity shall not exceed the amount to which the Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats and stevedores.

. . . . .

A proper evaluation of circumstances attending the allision requires a familiarity with the events leading up to the planned docking at Amorco on January 22, 1975. In the fall of 1974 Phillips' refinery workers, including the dockside linehandlers, were threatening to strike, at the end of that year. There was a distinct possibility that, incident to such a strike a waterborne picket line would be established and maintained in the immediate vicinity of Phillips' Amorco Wharf. Furthermore, indications were that should the strike and picketing materialize, Phillips could no longer depend upon its normal sources of river pilots and tugs. Consequently, Phillips, if it was to avoid an interruption in its supply of crude oil, would require the services of a so-called "independent" river pilot who would, if necessary, cross such a picket line and dock NORFOLK without tug assistance. There were three independent self-employed pilots in the area: Captains Kenneth Hulme, Leo Wuesthoff and Frank Pierce. Phillips sought the services of Captain Hulme, who had in the past rendered piloting services to Phillips and in whom Phillips had confidence; Phillips had no previous experience with the other two. Captain Hulme, upon being fully advised of the situation, told Phillips he would dock its vessels under such circumstances, but that he could not guarantee his availability for every Phillips vessel that might require a pilot during the strike period. He stated that this was because he must give first priority to his regular customers, which did not include Phillips. Phillips expressed its intention to utilize his services on that basis.

Phillips contacted Captain Hulme a few days prior to NORFOLK's arrival to arrange for her piloting into Amorco. He was told that NORFOLK would require his

services on the night of January 21–22 and that there was reason to believe that a strike might commence that very night at midnight. He thereupon tentatively agreed to act as her pilot. On the evening of January 20 Captain Hulme developed a scheduling conflict and called Captain Wuesthoff to inquire as to his availability to pilot NORFOLK. Captain Hulme ascertained that Captain Wuesthoff was indeed available and immediately called Phillips to disclose his conflict and to advise that Captain Wuesthoff could serve in his stead. The Phillips representative in this particular conversation was its then supervisor of operations, Charles Madison. While the precise details of this conversation are not known, it does appear that Captain Hulme briefly described to Madison Captain Wuesthoff's background and relevant piloting experience that qualified him to handle the NORFOLK assignment. Captain Hulme did not expressly communicate a personal recommendation or endorsement of Captain Wuesthoff, but he considered, as did Madison, that his suggesting Captain Wuesthoff for the job together with the description of his qualifications was tantamount to such a recommendation.

On the morning of January 21 Madison along with Phillips Port Captain, Seth Hargrave, discussed specific arrangements for NORFOLK with Captain Wuesthoff. As a result of this discussion it was understood and agreed that upon boarding NORFOLK Captain Wuesthoff would proceed to Anchorage 25 in Carquinez Strait there to receive a boarding party and undergo customs inspection and thereafter proceed about two miles farther up river to Amorco Wharf where a starboard berthing was mutually contemplated. It was further understood that NORFOLK would dock with her bow adjacent to the up river end of the wharf and that head lines would not be run to mooring buoys as was customarily done because of the still possible strike of Phillips' linehandlers who were needed to secure and cast off such lines.

As it happened a strike was averted thus making available tug assistance (and linehandlers). Two tugs had earlier been engaged by Captain Hulme to attend NORFOLK, and Captain Weusthoff was content to retain that arrangement. In other respects the original docking plan remained intact.

Captain Wuesthoff boarded NORFOLK off Alcatraz Island at about 1645 hours, January 21, and brought her to anchor at Anchorage 25 at 2028 hours. There she was boarded, a customs inspection was conducted and the boarding party departed at 2315 hours. NORFOLK did not get underway immediately but remained at anchor to await the beginning of ebb current which was anticipated momentarily. As she waited her bow lay down river as a result of her stern having earlier swung 180° upstream with the flood. Captain Wuesthoff expected the onset of the ebb to likewise swing NORFOLK's stern 180° at which time she would again be headed up river ready to proceed to Amorco Wharf on the beginning ebb. At 0045 hours, January 22, Captain Wuesthoff weighed anchor upon concluding that the ebb current had commenced but was too weak to swing the vessel back around.

Immediately upon weighing anchor or perhaps shortly after getting underway, the evidence being in conflict, it became apparent that NORFOLK was lightly aground at a point in the channel where the current navigational charts and supplementing information in the form of notices to mariners indicated ample depth. In fact, however, some shoaling had occurred subsequent to the publication of said charts and notices that accounted for the lack of indicated depth. NORFOLK was not again freely afloat until about 0210 hours after having received needed assistance from the two tugs in attendance. NORFOLK had lost nearly two and one half hours in the grounding episode, and her revised estimated time of arrival at Amorco Wharf was 0400–0430 hours. Captain Wuesthoff consulted his tide and current tables upon departing Anchorage 25 to determine what conditions would prevail during the docking operation. Having made his calculations, Captain Wuesthoff concluded that NOR-

FOLK could safely dock throughout that period of time in the manner agreed upon with Phillips. NORFOLK steamed up river toward Amorco in an early morning fog, January 22.

It was 0400 hours as NORFOLK neared the wharf. The fog was dense, but Captain Wuesthoff was able to make out the lights on the wharf and maneuver toward them. As NORFOLK closed upon the wharf at 0410 hours Captain Wuesthoff ordered her port anchor dropped to slow her progress. At 0430 hours NORFOLK drew abreast the wharf but to her misfortune was much too far away to throw heaving lines to the waiting Phillips' linehandlers on the wharf. Such was the fleeting opportunity NOR-FOLK had to dock uneventfully, because almost immediately her stern began to swing inexorably to port away from the dock pushed by the beginning flood current. Captain Wuesthoff quickly grasped the situation and, in an effort to check the swing, directed the tug then working at NOR-FOLK's port bow to join the other tug pushing on NORFOLK's after port quarter. The joint efforts of the tugs proved unavailing, and NORFOLK steadily swung around in the current.

The Benecia/Martinez Highway Bridge is situated approximately 225 yards (roughly the length of NORFOLK) up river from the nearest end of Amorco Wharf. Each of its piers has a protective framework or "fender" around it to minimize pier damage in the event of impact. NORFOLK, thanks in large part to some skillful navigation by Captain Wuesthoff and the tugboat skippers, came to rest in contact with only one pier against her after port quarter thus averting a possible catastrophe: her broadsiding against two piers thereby creating a dam across the ship channel to the great peril of herself, her cargo and the local environment. Impact occurred at 0504 hours some 25 minutes after her stern was first caught by the flood. NORFOLK, with the assistance of a third tug, was finally off the bridge at 0735 hours. She then successfully completed a portside berthing along Amorco Wharf without further incident.

■ Phillips maintains a small workboat, the ASSOCIATED, at its wharf. ASSOCIATED is ordinarily used to run lines from incoming vessels to nearby mooring buoys after the vessel has berthed with spring and stern lines secured to the wharf. Because NORFOLK's docking plan did not contemplate the use of the mooring buoys, Phillips' dockside employees had not readied ASSOCIATED for use when NORFOLK arrived on January 22. Nonetheless, ASSOCIATED could, if necessary, have been put to service in a matter of minutes. Norfolk contends that had Phillips' dock workers promptly launched ASSOCIATED when it first became apparent that NORFOLK was under the influence of the flood current, a head line could have been run from ship-to-shore by ASSOCIATED in time to check the up river movement of NORFOLK shy of the bridge. The Court finds otherwise, notwithstanding conjectural testimony by Captains Wuesthoff and Aristotilis Paterakis (NORFOLK's then master) that such a mission would have succeeded. The many uncertainties inhering in the suggested rescue operation make its success extremely doubtful. The evidence does not establish the time at which the dock workers appreciated, or should have appreciated, NOR-FOLK's predicament. Heavy fog obscured the vessel—probably to a greater extent than it did the well-lit wharf to those aboard NORFOLK. The evidence does not establish with reasonable certainty the time required to launch ASSOCIATED, maneuver her alongside NORFOLK, receive a line and return to the wharf to secure it. A few minutes one way or the other would be critical in the circumstances. Perhaps most significantly, the evidence is totally inadequate to demonstrate that such a head line, once secured at the pier, would have held or, even if it had, would have confined NORFOLK's bow close enough to the wharf to keep her swinging stern away from the bridge.

■ NORFOLK was equipped with VHF radio at the time under consideration, but Amorco Wharf was not—thus precluding direct ship-to-shore communication during

the incident. That such a capacity for direct communication would enhance the safety and convenience of vessel docking is evident from both common sense and the relevant testimony. A good illustration of the value of such communication is seen herein when shortly after the allision while NORFOLK still lay against the bridge pier, Captain Hargrave arrived at Amorco Wharf with a portable VHF unit which enabled him to assist Captain Wuesthoff in formulating a plan to get NORFOLK off the pier and safely to the wharf. Still, NORFOLK could have established ordinary commercial telephone communication with the wharf by using her VHF to raise the marine operator who could then complete the connection by commercial telephone or, alternatively, could have contacted the tender of the Southern Pacific Railroad Bridge (located up river of and immediately adjacent to Benecia/Martinez Bridge) who was also equipped with VHF to have him relay a message to the wharf by commercial telephone. In the final analysis, though, lack of communication with the dock was not a factor in the casualty. There was simply no way in which dockside personnel could have rendered aid once the big ship lost her stern to the flood. Captain Wuesthoff himself suggested no specific assistance, other than the earlier-discussed use of ASSOCIATED, that could have been provided.

The tidal current tables in general use by San Francisco Bay area pilots (including Captain Wuesthoff) in January, 1975 were based upon emergency daylight saving time which it originally appeared would be in effect that month. However, due apparently to the energy crisis and considerations related to the safety of school children, standard time was instead in effect. As a result, the listed times in the current table referred to by Captain Wuesthoff on January 21–22 were uniformly one hour later than the true time for the indicated phenomena. It seems probable, and the Court finds, that Captain Wuesthoff was cognizant of the need to take this extra hour into

account in making his calculations for NORFOLK. A proper calculation reveals the true time for beginning flood current in the vicinity of Amorco Wharf on the morning in question to be very nearly 0435 hours. However, the current table from which this calculation was made and to which Captain Wuesthoff referred was either set forth in or derived from a volume of tidal current tables for 1975 published by the National Oceanic and Atmospheric Administration which states at page 2 that

[i]n using this table it should be borne in mind that actual times of slack or maximum occasionally differ from the predicted times by as much as half an hour and in rare instances the difference may be as much as an hour.[1]

It seems quite possible that in a momentary lapse Captain Wuesthoff computed the expected current conditions to attend docking without allowing for the one hour error built into the table—thus anticipating the commencement of flood at about 0535 hours. That is nothing more than speculation, though, in the face of Captain Wuesthoff's direct testimony that he intended to arrive at the time he did knowing full well the state of the current.

There is evidence to the effect that Phillips' own masters, regular Phillips employees who also acted as river pilots for their respective Phillips vessels, observed a custom of not docking at Amorco during the last hour before low water slack (which, of course, immediately precedes flood). Such custom was established in view of a general preference for landing starboard side to the wharf and the fact that an early flood current greatly endangers vessels making such a landing—witness the experience of NORFOLK. Phillips is charged with fault in not communicating this custom or the reason for it to Captain Wuesthoff. The wisdom of the described custom, however, was not rooted in subtle facts. It was, rather, based upon facts and principles known well to all river pilots. It is too obvious to require disclosure that there is considerable risk in attempting a starboard

1. Exhibit A–3 at p. 2. .

berthing at Amorco within one hour of the predicted commencement of flood. The current tables used by the local pilots effectively disclaim any greater accuracy for such predictions than ± 30 minutes and clearly indicate the possibility of error as great as one hour. The fact that a vessel in the process of docking tends to lose maneuverability and swing around stern first when suddenly caught by a pushing current from behind is elementary—at least to qualified river pilots. Qualified pilots should further appreciate that the close proximity of the highway bridge to Amorco magnifies the danger posed by such a "surprise" flood to vessels in the process of docking. No nautical brilliance is required to conclude that the good practice for a vessel desiring to berth with her starboard side to Amorco Wharf is to eschew all attempts to dock during a 60 minute interval preceding the predicted commencement of flood. Captain Wuesthoff's docking plan as formulated at Anchorage 25 on January 22 called for NORFOLK to be maneuvering off the wharf in preparation to dock starboard side to the wharf as late as 0430 hours—about five minutes before the predicted commencement of flood.

Captain Wuesthoff was first qualified by the Coast Guard to pilot vessels in the San Francisco Bay area in 1948. At the time of his assignment aboard NORFOLK he held, and had for many years held, a Coast Guard license to act as master of vessels, unlimited tonnage, in inland waters and as a first class pilot in San Francisco Bay and its tributaries together with pilot's licenses issued by Stockton and Sacramento Port Districts for waters under their control. None of these licenses have ever been revoked or suspended. There were two official blemishes on Captain Wuesthoff's long record of service as a pilot: a 1967 reprimand issued by the Sacramento-Yolo Port District for errors in judgment while piloting M/V IL-ICE which struck the Rio Vista Bridge and a 1971 probation order from the Coast Guard for piloting decisions made aboard M/T STOLT CONDOR while navigating the Sacramento River. Notwithstanding those two incidents, Captain Wuesthoff was in January, 1975 an experienced river pilot familiar with river conditions in the vicinity of Amorco Wharf and the Benecia/Martinez Highway Bridge. Over the years he had piloted a great number of vessels, some larger that NORFOLK, through these waters in good weather and bad and had docked numerous tankers at various area facilities including Amorco Wharf—though not recently at Amorco.

## ANALYSIS

### I. Norfolk (Vessel Owner)

■ California State law does not compel vessels to employ state-licensed pilots when traversing the waters herein involved. Consequently, Captain Wuesthoff was serving aboard NORFOLK as a noncompulsory or "voluntary" pilot. It is now a settled proposition of law that a voluntary pilot aboard a vessel under time charter is the servant of the vessel owner and not the charterer.[2] While it would seem to be true that the time charterer and vessel owner have contractual freedom to re-allocate *inter se* the responsibility for pilot error, as against the rest of the world the general rule still obtains.[3]

■ Captain Wuesthoff's mismanagement of Norfolk is obvious from the recited

---

**2.** This has been time and again held to be true even where, as here, the time charter provides that charterer is to provide and pay for pilotage. *See, e. g., United States v. S. S. PRESIDENT VAN BUREN,* 490 F.2d 504, 506–07 (9th Cir. 1973); *The WEST ELDARA,* 101 F.2d 45, 47–48, *modified on rehearing,* 104 F.2d 670, 671 (2nd Cir. 1939); *The VOLUND,* 181 F. 643, 666 (2nd Cir. 1910); *Delaware River Terminals, Inc. v. M/S ANCORA,* 253 F.Supp. 884, 886–87 (E.D.Pa.1966); *California v. The JULES FRI-*

*BOURG,* 140 F.Supp. 333, 337 (N.D.Cal.1956). [the latter four cases specifically involving such charter provisions].

**3.** *Cf. The WEST ELDARA,* 101 F.2d 45, *modified on rehearing,* 104 F.2d 670 (2nd Cir. 1939); *The VOLUND,* 181 F. 643 (2nd Cir. 1910); *California v. The JULES FRIBOURG,* 140 F.Supp. 333 (N.D.Cal.1956); *The NIELS R. FINSEN,* 52 F.2d 795 (S.D.N.Y.1931). No such attempt at reallocation was made herein, however.

facts. It was poor judgment—negligent judgment—to attempt the planned docking at such a state of the current. The risk posed by the current was enlarged by the obscured visibility which no doubt played its part in NORFOLK's failure to approach the wharf close enough to heave lines, a further deficiency in piloting for which Captain Wuesthoff must bear responsibility. Navigational decisions affecting the safety of the vessel are to be made by the pilot (with the master's supervision) rather than charterers or shoreside personnel. Captain Wuesthoff so concedes. The faults of Captain Wuesthoff are imputed to Norfolk, his master, for purposes of fixing liability.[4]

## II. Phillips (Charterer and Wharfinger)

It having been previously held that Captain Wuesthoff was not acting as Phillips' servant in rendering the services in question, fault can be assigned to Phillips only in respect of a failure to fully discharge its respective legal duties as charterer and wharfinger—which failure contributed to the casualty. Norfolk suggests several different instances of breached duty by Phillips which deserve consideration.

 Two of Phillips' express duties according to the terms of the charter were to provide pilotage and to "exercise due diligence to ensure that the vessel is only employed between and at safe ports, places, berths, docks, anchorages . . . where

she can always lie safely afloat." Regarding the duty to provide pilotage, Norfolk contends that it carries with it an implied duty to exercise due diligence to provide a pilot reasonably fit and qualified for the particular assignment.[5] The Court agrees.[6] Phillips breached this implied duty, argues Norfolk, in failing to make sufficient inquiry into Captain Wuesthoff's background and reputation before hiring him to properly assess his competence. The Court finds to the contrary that Phillips was under no obligation to conduct further investigation into Captain Wuesthoff's qualifications before hiring him and that, moreover, the most exhaustive inquiry would not—based upon the evidence presented—have revealed information requiring his disqualification. Phillips knew, or could reasonably have assumed, that Captain Wuesthoff held the requisite license that entitled him to pilot vessels like NORFOLK on the subject waters. That certainly is indicative of minimal competence inasmuch as such licenses are issued following a Coast Guard examination designed to measure fitness, are subject to renewal and are withdrawn if the Coast Guard becomes aware that a pilot has ceased to be competent. In addition to being licensed in the manner prescribed by law, Captain Wuesthoff had been recommended to Phillips by Captain Hulme, a pilot whose work Phillips knew and whose judgment Phillips justifiably respected.

---

**4.** The same practical result follows from the valid charter provision set forth in the text *supra* that

> [o]wners hereby indemnify Charterers . . . against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots . . . who although employed by Charterers shall be deemed to be servants and in the service of Owners and under their instructions.

Were this charter a contract of adhesion with provisions like the above extracted from a helpless party, public policy might require the vitiation of the objectionable terms, but from all that appears this charter was a bargained-for agreement between parties of roughly equal economic strength dealing at arms' length. Therefore the indemnity provision is plainly valid within the rational of *Sun Oil Co. v. Dalzell Towing Co.*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932), and *United States v. S. S.*

*PRESIDENT VAN BUREN*, 490 F.2d 504, 507–09 (9th Cir. 1973). *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), cited by Norfolk as dictating a contrary rule is inapposite. *Bisso* involved an attempt by a towing company to exempt itself from all liability for its negligent towage, and the holding of *Sun Oil* regarding pilotage indemnity clauses was expressly distinguished.

**5.** Norfolk further contends that the charterer's indemnity clause quoted in note 4, *supra*, does not negative such duty or shift it to the vessel owner. This contention poses a construction problem that need not be here resolved. For present purposes it will be assumed that Norfolk's argued interpretation is indeed correct.

**6.** *See Delta Engineering Corp. v. Scott*, 322 F.2d 11, 18 (5th Cir. 1963); *cert. denied*, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964).

Such recommendation, reinforced by Captain Hulme's description of Captain Wuesthoff's relevant experience, sufficiently established Captain Wuesthoff's fitness and served to discharge Phillips from any further duty of inquiry. The evidence taken as a whole amply demonstrates Captain Wuesthoff's general competence to undertake the assignment.

■ Because Phillips acted in the dual capacity of charterer and wharfinger, its duty to use due diligence to insure the safety of Amorco Wharf insofar as Norfolk was concerned arose from two independent sources: pursuant to the charter as aforesaid and generally as a consequence of its status as a wharfinger. To the extent that the requirements of "due" diligence would be in this regard different for a charterer and a wharfinger, it would logically be the wharfinger, who operates the facility, of whom greater diligence would be expected. A wharfinger's duty has been thus characterized:

> [A] wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any *hidden* hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him *and not reasonably known to the shipowner.* [citations omitted] But, there is no duty on the part of a wharfinger to provide a berth with safe surroundings (other than an entrance and exit) or to warn that hazards exist in the vicinity . . . .[7] [emphasis supplied].

Applying the above standard, Norfolk has wholly failed to establish any breach of duty by Phillips proximately related to the allision. It was caused rather by Captain Wuesthoff's decision to dock NORFOLK in heavy fog at a precarious state of current. Such misgovernment of the vessel reflects in no way upon the inherent safety of Amorco Wharf and the adjacent waters—on the contrary, any docking at any wharf will present dangers when the vessel is navigated without due regard for existing conditions of tide, current and weather. Furthermore, even assuming that Phillips' personnel realized the risk facing NORFOLK in docking when she did,[8] Phillips had no duty to inform Captain Wuesthoff of the obvious or to invade his area of expertise. The vessel's navigation was solely in the hands of Captains Wuesthoff and Paterakis at the time, both of whom were then servants of Norfolk.

■ Norfolk makes much of the grounding at Anchorage 25 and the fact that certain Phillips masters apparently were aware of some shoaling in that area (although uncertain as to its extent). It is argued that Phillips' failure to disclose that "in-house" information to Captain Wuesthoff and the designation of an anchorage with insufficient water to accommodate NORFOLK constitute breaches of its duties under the charter and as wharfinger which contributed to the casualty. This theory of contributory fault fails too, because the grounding episode was essentially unrelated to the bridge damage herein complained of. The loss of time at Anchorage 25 by reason of the planned layover as well as the grounding was undoubtedly a condition or circumstance of the allision absent which it would not have occurred, but it was not a proximate, legal cause of same. The allision need not have taken place after the grounding—it *should* not have taken place. Once afloat again off the shoal, good seamanship dictated a different docking plan than that settled upon by Captain Wuesthoff; certainly a different arrival time was indicated as well as possibly a portside landing if NORFOLK was to be brought in on the flood. The grounding merely provided an occasion for poor seamanship to work substantial mischief.

Norfolk's remaining contentions concerning the absence of linehandlers at the

---

7. *Trade Banner Line, Inc. v. Caribbean Steamship Co., S.A.,* 521 F.2d 229, 230 (5th Cir. 1975).

8. The evidence would not, however, require that finding.

wharf, the failure to render assistance with ASSOCIATED and the lack of adequate communication facilities at the wharf have been earlier addressed and disposed of. The evidence herein reveals no breach of any duty by Phillips that was a proximate cause of the casualty.

## CONCLUSION

Accordingly, and consistent with the foregoing, plaintiff shall recover of defendant vessel and Norfolk its provable damages sustained as a result of the allision and taxable costs. Plaintiff's claim and Norfolk's cross-claim against Phillips are dismissed with prejudice with Phillips' costs to be borne equally by plaintiff and Norfolk. Counsel for plaintiff shall forthwith prepare and submit an interlocutory decree in conformance herewith. If the parties are unable to agree upon damages within 30 days from the date hereof, or such extension thereof as the Court may grant, a Special Master shall be appointed for the purpose of so determining. The foregoing shall constitute the Court's findings of fact and conclusions of law within the meaning of Fed.R.Civ.P. 52(a).[9]

---

**9.** The word "protective" as used herein refers to the intended purpose of the fender system. The adequacy thereof for such intended purpose was not at issue during the course of the trial on liability and the Court makes no finding with respect thereto.