**PORT OF SEATTLE and Cargill Incorporated, Plaintiff,**

**v.**

**M/V SATURN, and Saturn Bulk Carrier, Inc., Defendants.**

**Saturn Bulk Carrier, Inc., Claimant.**

**No. C81–82B.**

United States District Court,
W.D. Washington.

Jan. 5, 1983.

James R. Hermsen and Mary Ellen Hanley, Dwight L. Guy, Seattle, Wash., for plaintiff Cargill.

Gerald W. Gelfand, Seattle, Wash., for plaintiff Port of Seattle.

Thomas J. McKey and Richard A. Montgomery, Seattle, Wash., for defendants M/V SATURN and Saturn Bulk Carrier, Inc. and Claimant, Saturn Bulk Carrier, Inc.

## MEMORANDUM OF DECISION

BEEKS, District Judge.

In the early evening darkness of January 24, 1981, the M/V SATURN collided with Pier 86 on Elliott Bay in Seattle, Washington. The Port of Seattle and Cargill, Inc., owner and lessee/operator of the pier respectively, instituted this action against the vessel and her owner for the resulting damages. The vessel was arrested on January 26th. Saturn Bulk Carrier, Inc. (Saturn) claimed the vessel as owner and secured her release. Thereafter, defendants counterclaimed against plaintiffs for repair costs, loss of hire, and damages for the excessive security which they allege was required to secure the vessel's release.

Trial, limited to the issues of liability, was held on December 7, 1982.

M/V SATURN is a bulk carrier, 224.4 meters in overall length, with a gross tonnage of 31,242 tons. The vessel is owned by claimant Saturn, a New York corporation. At the time of the accident, the vessel was properly equipped and in good operating condition.

As M/V SATURN began her approach to the pier, Captain Kan Soo Lee, the vessel's master, Captain Pok Soo Kim, the vessel's relief master, the third mate, the helmsman, and the pilot, Captain John Trimmer, who was conning the vessel, were all on her bridge. A pilot was required in the waters involved by the laws of the State of Washington. *See* Wash.Rev.Code § 88.16.070 (Supp.1982). The pilot gave rudder commands in English to the helmsman and bell commands to the master who relayed them to the third mate to telegraph to the engineroom. The vessel's chief mate, Gyeong Ha Mun, was stationed on the forecastle head along with the boatswain and three sailors. The chief mate was equipped with a hand held 90-watt search light and a walkie-talkie with which he communicated to the master.

Approximately three-quarters of a mile from the pier, the pilot positioned the tugs, SHANNON FOSS and CAROL FOSS, which were assisting. At 1746 the M/V SATURN'S engine was stopped in order that the tugs could be made up to the vessel. Even though the engine was stopped, the vessel continued to make headway at a speed of approximately five knots. The pilot positioned the tugs at right angles to the vessel's starboard side; SHANNON FOSS was made up on the after starboard quarter, and the CAROL FOSS the forward starboard side near the bow.

As M/V SATURN began her final approach to the dock, darkness had commenced, visibility was six miles, and there was a southwest wind of approximately eight knots. The tide was flooding with weak rotary currents setting towards the northwest. The water surface had a light chop.

The face of Pier 86 is approximately 425 feet in length. It roughly parallels the shore line and constitutes the loading dock of the grain terminal. It is equipped with five towers which support a shipping gallery that is connected to the main grain storage area by a pier. Each tower is equipped with two 1000 watt mercury flood lights which shine downward, illuminating the general working area of the dock and the surrounding water. At the time of the accident, the pier was not equipped with red corner lights.

The pilot elected to approach the pier at an angle somewhere between twenty-five to forty-five degrees. The vessel's engine was dead slow and the rudder hard right. The pilot ordered the forward tug to back and the after tug to push, in order to maneuver the port side of the vessel alongside the dock.

The chief mate on the bow first sighted the dock at a distance of approximately 170 meters, at which time he informed the master by radio that the dock had been sighted. Less than a minute later, the chief mate reported that M/V SATURN was 100 meters off the dock. The master relayed this information to the pilot with the warning that the vessel was proceeding too fast. At this time, the pilot estimated the vessel was still making approximately one to two knots. At 80 meters the master again relayed the vessel's distance from the dock to the pilot followed by a second warning to reduce speed. At a distance of 60 meters, the pilot ordered slow astern. At 20 meters, the master gave the pilot a third warning following which the pilot ordered full astern and the master himself directed emergency full astern. At 15 meters, the chief mate and his bow crew ran from the forecastle head to avoid injury. Simultaneously, the longshoremen, who were awaiting the vessel's arrival, also ran for safety. The vessel then struck the pier causing substantial damage. Following the allision, the vessel was taken to an anchorage area and anchored. Thereafter, M/V SATURN was berthed at Pier 86 without incident.

■ The law is well settled that a moving vessel which strikes a stationary object such as a dock is presumptively at fault. *Bunge Corp. v. The M/V FURNESS BRIDGE,* 558 F.2d 790, 794–95 (5th Cir. 1977). To overcome this presumption, the moving vessel must show either (1) she was without fault, (2) the allision was occasioned by the fault of the struck object, or (3) that it was the result of an inevitable accident. *Carr v. Hermose Amusement Corp.,* 137 F.2d 983, 985 (9th Cir.1943). In the case of allision with a pier, the ship owner may rebut the presumption of negligence by proving that the wharfinger violated a required standard of care and that this violation was the proximate cause of the damage claimed. *California v. The S/T NORFOLK,* 435 F.Supp. 1039, 1048 (N.D. Cal.1977). The duty of a wharfinger has been characterized as follows:

> [A] wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the ship owner. [citation omitted] But there is no duty on the part of a wharfinger to provide a berth with safe surroundings (other than an entrance and an exit) or to warn that hazards exist in the vicinity....

*Id.*

Defendants have failed to overcome the presumption and the court finds that under the existing circumstances M/V SATURN was proceeding at an excessive speed. The pilot testified that he was familiar with Pier 86 and its lights and had successfully berthed vessels there previously, including one berthing at night. If the pilot was in fact blinded by the pier lights as belatedly alleged by him and which the court does not find to be the fact, he was grossly negligent in attempting to berth the vessel. He should have proceeded to anchorage until visibility improved. The cargo lights did not render the pier unsafe and, in the court's opinion, were not a proximate cause of this allision which was not inevitable and should have been avoided.

■ Defendants maintain that the operation of the pier lights also constituted negligence *per se* in that plaintiffs violated 33 C.F.R. § 93:34 (1981) and Seattle, Wash. Harbor Code § 16.20.170 (1980). Section 93.34 is a part of the "Pilot Rules for Inland Waters," and provides:

Flashing the rays of a search light or other blinding light onto the bridge or into the pilothouse of any vessel under way is prohibited. Any person who shall flash or cause to be flashed the rays of a blinding light in violation of the above may be proceeded against in accordance with the provisions of R.S. 4450, as amended, looking to the revocation or suspension of his license or certificate.

The Pilot Rules are regulations pertaining to vessels navigating the harbors, rivers, and inland waters of the United States. 33 C.F.R. § 93.01 (1981). As such, the court finds that the regulation does not apply to shore structures such as Pier 86. The same holds true for § 16.20.170 of Seattle's Harbor Code which provides:

It shall be unlawful for the master, owner or any other person in charge of any watercraft or vessel, while lying at any pier or while navigating in Seattle Harbor, unnecessarily to cause any whistle or siren to be blown or sounded, nor shall any person flash the rays of a search light or other blinding light onto the bridge or into the pilothouse of any vessel or watercraft under way for any purpose other than those authorized by law.

Section 16.20.170 regulates the operation of vessels and watercraft, and cannot reasonably be construed to apply to pier lights.

Neither 33 C.F.R. § 93.34 nor Seattle Municipal Code § 16.20.170 (1980) are applicable with respect to the facts herein. The purpose of each is to prevent lights from being flashed onto a vessel while under way. Neither apply to shoreside lighting. Their operation was not negligent.

▮ Defendants additionally claim that the plaintiffs were negligent *per se* in that they violated the following ordinance and regulation:

In the interests of safe navigation and the protection of property the Port Warden shall establish standards for the lighting of piers in the harbor. Between the hours of sunset and sunrise all piers shall be kept lighted in accordance with requirements of the Port Warden. All walks, passageways, openings or gang-ways upon any pier upon or through which passengers may pass shall be kept adequately lighted between sunset and sunrise.

Seattle, Wash. Harbor Code § 16.52.020 (1980). Pursuant to this ordinance, the Port Warden promulgated the following regulations:

On any structure extending into any navigable waters of the City of Seattle, pier lights shall be displayed as follows:

On each corner of the structure extending into water, a red light shall be displayed.

Lights are to be placed as near the seaward corners and as nearly level to the floor elevation as is practicable.

Lights should be so placed and be of such intensity that they will be clearly visible when being approached from seaward for a distance of one mile.

Any pier lights, other than the lights described in the foregoing, shall not be displayed in any manner that will interfere with the identification or location of the pier, wharf or structure.

Pier 86 was not equipped with such lights on January 24th, and the owners and operators of the pier were thus in violation of an express duty to operate required lights. Such fault on behalf of plaintiffs invokes a rule of law known as the Pennsylvania Rule which creates a presumption of fault and burdens the violating party to show, "not merely that the fault might not have been the cause of the collision or that it was probably not, but that it could not reasonably have been." *California v. The Italian Motorship ILICE*, 534 F.2d 836, 839 (9th Cir.1976); *see The Steamship PENNSYLVANIA v. Troop*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

Plaintiffs attempt to overcome this presumption by attacking the validity of the ordinance and the regulation of the port warden enacted thereunder. In particular, plaintiffs point to the absence of any "legislative" history as to how the port warden's regulation was promulgated. The absence of "legislative" history, however, does not

invalidate a regulation. Having considered the evidence offered in support of the regulation, the court is satisfied that the regulation is valid and applicable to the facts herein and that the absence of the required red lights on Pier 86 contributed to the allision. Both the pilot and the vessel's master testified that the presence of the required red pier lights would have aided them in attempting to berth the vessel.

Under the comparative negligence standard set forth in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), it is culpability, not degree of causation, on which liability is apportioned between wrongdoers. *Alaska Packers Association, Inc. v. O/S EASTPOINT*, 421 F.Supp. 48, 53 (W.D.Wash. 1976). With this in mind, and consistent with the above findings and conclusions, the court holds M/V SATURN to be primarily culpable. Due to the fact that the M/V SATURN was under command of a compulsory pilot, the court finds the owner of the vessel is not personally liable for the negligence of the compulsory pilot, the doctrine of respondeat superior being inapplicable. *See California v. The Italian Motorship ILICE, supra,* at 843.

Accordingly, the court finds fault as follows: M/V SATURN, 90% at fault; Port of Seattle and Cargill, 10% at fault.

If the parties are unable to agree upon damages within 30 days from the date hereof, either a Special Master will be appointed or a trial date set for the purpose of so determining.

This Memorandum of Decision shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.