**CUMBERLAND COUNTY UTILITIES AUTHORITY, Plaintiff,**

v.

**The M/T DELBAR, her engines, boilers, etc., and The ARGOIL 150, her engines, boilers, etc. and Taylor and Anderson; and Delaware River Barge Company; and Interstate and Ocean Transport Company and Gellenthin Bulk Transportation Corporation and Interstate Towing Company, Defendants.**

Civ. A. No. 81–158.

United States District Court, D. New Jersey.

Jan. 27, 1985.

Gerald P. Harney, Westmont, N.J., for plaintiff.

German, Gallagher & Murtagh by Dean F. Murtagh, Philadelphia, Pa., for defendants, The M/T Delbar, her engines, boilers, etc. and Taylor and Anderson and Delaware River Barge Co.

Cattell & Keating by Stuart M. Goldstein, Haddonfield, N.J., for defendants, Interstate and Ocean Transport Co., Gellenthin Bulk Transp. Corp. and Interstate Towing Co.

COHEN, Senior District Judge.

Plaintiff, Cumberland County Utilities Authority (CCUA), instituted this action pursuant to 28 U.S.C.A. 1333, the Court's admiralty jurisdiction, to recover for damages to its submerged outfall line after it had been struck by the defendants' barge and tugs on two separate occasions, the first on July 6, 1978, the second, a year later on July 14, 1979. Plaintiff seeks damages in the amount of $107,685.08 against defendants, the tug M/T Delbar, Taylor and Anderson, the operator of the M/T Delbar, Delaware River Barge Company, the owners of the M/T Delbar, and Gellenthin Bulk Transport Corporation, the owner of the barge Argoil 150, for the cost of repairs necessitated by the first incident. Plaintiff seeks damages totalling $99,876.57 against Interstate Towing Company, operator of the tug Transporter and the barge Argoil 150, Interstate and Ocean Transportation Corp. and Gellenthin Bulk Transport Corporation for the cost of repairs caused by the second collision.

A non-jury trial was held in this matter. This opinion is submitted in lieu of findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FACTUAL BACKGROUND

Plaintiff, CCUA, is a regional sewage and waste treatment authority, located in Bridgeton, New Jersey. It is organized and exists under the laws of New Jersey. As part of its operation, the CCUA owns and maintains an outfall line which extends from its sewage treatment plant, located on the bank of the Cohansey River into the Cohansey, a navigable waterway. This outfall line is a pipe which measures four feet in diameter and extends approximately 320 feet into the river. The Cohansey River is approximately 600 feet wide in this area. (Tr. Vol. 1, p. 10). The terminus of the outfall line, then, extends more than halfway into the middle of the river. The outfall line was constructed by Vicon Construction Company; Engineering Services were provided by John G. Reutter and Associates in accordance with an application and drawings submitted to and permit issued by the United States Corps of Engineer. Construction of the outfall line began in November of 1977, and continued through the end of March 1978. (Tr. Vol. 1, p. 12). During this period of construction, the pilings supporting the outfall line were visible only at low tide. A work barge was present at the end of the outfall line at all times during construction. (Tr. Vol. 1, p. 15). This part of the river was only navigable at high tide.

On July 6, 1978, at approximately 12:30 P.M., the barge Argoil 150, pushed by the tug Delbar, was proceeding up the Cohansey River on its way to the Petrunis Oil facility. As the barge and tug proceeded past the plaintiff's sewage treatment facility, they struck the outfall line.

At the time of this first collision, the pipe was marked by a sign, warning of the outfall line, positioned on the shore of the Cohansey where the outfall line entered the river, approximately 320 feet from the terminus of the pipe. The sign was 6 feet off the ground, was about four feet by four feet and faced the river, (Tr. Vol. 1, p. 21) not down so as to be seen by barges approaching the outfall line.

Information regarding the nature and location of the outfall line had previously been submitted to the United States Coast Guard by the John G. Reutter Associates. Acting on this information, the Coast Guard had advised the engineers that the most appropriate marker would be a "danger marker, i.e. a white marker with an orange diamond and the words DANGER OUTFALL placed within the diamond." (Plaintiff's Exhibit No. 9). The sign was to

be placed at the end of the pipe and *face down the river.*

Acting pursuant to this information, the plaintiff placed a second sign on the terminus of the outfall line. This sign, unlike the first, faced down the river. This was done following the first incident, but prior to the second. (Tr. Vol. 1, p. 24).

At the time of the first incident, there had been no Local Notice to Mariners [1], issued by the Coast Guard, and the presence of the outfall line had not been noted on the Loran Chart [2], issued by the National Oceanic and Atmospheric Administration. However, on October 11, 1978, after the first collision, the Coast Guard did issue a Local Notice to Mariners. (Tr. Vol. 1, p. 144). This notice gave the position of the outfall line and noted that it was marked by a day beacon. (Plaintiff's Exhibit No. 12). On October 25, 1978, a second Local Notice to Mariners was published correcting an error as to the location of the outfall line which existed on the first Notice.

The National Oceanic and Atmospheric Administration, an agency of the U.S. Department of Commerce, issued an updated edition of the Loran Chart in December 1978. This Chart noted the presence of the CCUA outfall line within the Cohansey River. Both the applicable Loran Charts, and the Local Notice to Mariners are required to be kept upon vessels by the tug captains when navigating rivers such as the Cohansey.

On July 14, 1979, at approximately 2:00 A.M., the very same Argoil 150 was again proceeding up the Cohansey River, but this time was pushed by the tug Interstate Transporter. The barge and tug, while attempting to navigate the river ran to the left of the daymarker, indicating the terminus of the outfall line, and struck the pipe. There was testimony advanced at trial that the night was dark and the only light came from the plaintiff's facility on the bank of the river. A lookout [3] was in place on the tug, using a spotlight to search for any obstructions in the water. Apparently, the lookout failed to see the sign. (Tr. Vol. 1, pp. 96–100).

The plaintiff is contending that both accidents were the result of negligence on the part of the tugs and the barge and, accordingly, seeks to recover for the damages done to the outfall line by all defendants.

The defendants maintain that their navigation of the Cohansey River was proper and the damage done to the outfall line was solely the fault of the plaintiff, itself, as the pipe was not sufficiently marked to warn approaching vessels of its presence.

## LEGAL DISCUSSIONS

 During the plaintiff's case, the Court took under advisement the admissibility of defendants' documents marked Interstate one and two [4] which were applications, made by the plaintiff, after the second collision, to the United States Army Corps of Engineers, for repair of its outfall line and for the installation of lights at the terminus of the outfall. The plaintiff objected to the introduction of these documents into evidence on the ground that

1. Notice to Mariners is a publication warning of navigational problems which have been referred to the U.S. Coast Guard. This publication is area specific and is designed to serve as an aid to those navigating in a particular vicinity.

2. The applicable Loran Chart is a detailed chart of the Delaware Bay, including the Cohansey River, published by the U.S. Department of Commerce. The CCUA outfall line was noted on this chart.

3. A "lookout" is a member of the crew who is specially charged with the duty of observing the lights, sounds, echoes, or any obstruction to

navigation. *See, The Tillicum,* 217 Fed. 976 (D.C.Wash.1914).

4. The attorney for defendants' Interstate and Ocean Transport Co. and Gellenthin Bulk Transportation Corp. referred to the documents during the cross-examination of one of the plaintiff's witnesses. The plaintiff objected to the use of these documents and the Court took the matter of their admissibility under advisement. This was done before the defendants moved the documents into evidence. Apparently, relying on the Court's representation, defendants' counsel never formally moved the documents into evidence.

they represent subsequent repairs and as such are inadmissible. (Tr. Vol. 1, pp. 56–60).

The applications, prepared by John G. Reutter Associates, who provided the engineering services for CCUA, requested a permit allowing the plaintiff to build protective structures around the terminus of the outfall line. The application stated, in part, that these additions were necessary since, "in the past, because of insufficient markers or installation of a day signal only, the outfall line has been hit twice by barges ...."

The defendants contend that these applications are admissible into evidence under Fed.R.Evid. 801(d)(2), Admission of a Party-Opponent. Further, the defendants urge that the applications should not be excluded as evidence of a subsequent repair, as they were not being offered to show negligence, rather, they were being submitted to show the feasibility of precautionary measures, Fed.R.Evid. 407, *Trent v. Atlantic City*, 334 F.2d 847, 869 n. 9 (3rd Cir.1964).

The plaintiff objects to the introduction of these applications into evidence, maintaining that they are inadmissible as they represent subsequent repairs which are not admissible when they are introduced to prove negligence or culpable conduct[5].

The exception, which allows proof of subsequent repairs to be admitted into evidence, applies only where the issue of feasibility is controverted, or, for purposes of impeachment. However, the question of feasibility of lighting the outfall line at night has not been controverted and the defendants are not contending that the applications have impeachment value. Therefore, they are not admissible under the exception to the subsequent repair rule.

Further, the applications are not admissible as an admission of guilt by a party opponent. The statement therein, that the present markers are insufficient, need not be construed as an admission. Hindsight is

always better than foresight and the fact that the outfall line had been hit twice, in little more than a year may well lead one to the conclusion that the existing means of marking the pipe were inadequate. Therefore, this is the precise situation contemplated by the subsequent repair provision contained in both the Federal and the New Jersey rules of evidence.

Consequently, the Court will sustain the plaintiff's objections to the use of the controversial applications and will not consider the same in reaching its decision.

■ Although, the outfall line did not actually extend into the channel of the Cohansey River, it did extend sufficiently far so as to present a threat to navigation. As a result, the plaintiff had a duty to see to it that the outfall line was adequately marked to give mariners proper notice of its presence. *Corby v. Ramsdell*, 48 F.2d 701, 703 (2d Cir.1931). Further, failure to properly mark the outfall line would represent a breach of this duty. *Kelley Island Lime and Transport Co. v. City of Cleveland*, 47 F.Supp. 533, 539 (N.D.Ohio 1942).

Plaintiff directs the Court's attention to the case of *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151 (2d Cir.1978). There, a tug and barge struck a submerged rock, the presence of which was charted on the marine maps of the area, and which rock was located outside the navigable channel in the Hudson River. The court found that the tug pilot was negligent in failing to maintain a proper lookout. The plaintiff contends that this case is applicable and that, following its reasoning, the Delbar should be found negligent in failing to maintain a proper lookout.

■ This argument, however, is not compelling. In *Tug Ocean Prince*, the rock was charted, and by maintaining a proper lookout the collision with the rock could have been avoided. In the case at bar, concerning ourselves with the first

5. The ground for this exclusion rests on a social policy of not discouraging people from taking steps in furtherance of added safety. *See,*

*Brown v. Brown*, 86 N.J. 565, 432 A.2d 493 (1981).

incident in July 1978, the sign warning of the presence of the outfall line was on the shore, some 320 feet from the end of the pipe, facing the river—not down the river, as it should have been. Although the mariner, by observing the sign, would be put on notice as to the presence of the line, there was nothing to inform him where the line ended. The existence of the line was not noted on the Loran Chart, and no Notice to Mariners had issued, at the time of the first incident, to put the pilot on notice as to where exactly the outfall line was within the waterway. Consequently, the plaintiff has failed to show, as required by a preponderance of the evidence, that the accident could have been avoided by the use of a lookout and, therefore, that the lack of the lookout was the proximate cause of the collision.

The plaintiff further asserts that even absent the noting of the outfall line on the Loran Chart, or the issuance of the Notice to Mariners, the defendants had constructive notice as to the pipe's existence because the Delbar had navigated this part of the river during the time the pipe was being constructed. (Tr. Vol. 2, p. 6). Hence, the captain would have seen the work barge present at the end of the outfall line and, accordingly, would have passed the information, that there was construction taking place on the river, on to the next captain and crew taking charge of the tug. (Tr. Vol. 2, p. 20). There was, however, no evidence advanced by the plaintiff that this had in fact taken place or that any captain, charged with responsibility for the tug Delbar, had been put on notice by the presence of the barge within the river. Such a contention is sheer speculation.

Absent this constructive knowledge on the part of the mariners involved, as to the existence of the outfall line, and absent notice in the form of a Notice to Mariners or a noting on the Loran Chart, the defendants' mariners had the right to use the full reach of the river. They also had the right to be free of underwater hazards unless properly marked to give them notice both of the presence and the location of the

hazard. *Plantation Pipe Line Company v. Findlay Towing Company, Inc.*, 1977 A.M.C. 2553 (S.D.Ala.)

Accordingly, the Court finds no negligence on the part of the mariners on the tug Delbar and the barge Argoil 150 and denies recovery to the plaintiff, Cumberland County Utilities Authority, for damage to their outfall line resulting from the first collision in July 1978.

As to the second collision, occurring a year later in July of 1979, the defendants present a line of cases for the Court to consider which were decided pursuant to the Wreck Act, 33 U.S.C.A. § 409 (West 1970). This Act provides that:

whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, ..., it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night.

The defendants assert that the requirement that an obstruction be lit at night is applicable to the present case. Although no cases have been brought to the Court's attention where the lighting requirements of the Wreck Act were applied in a case falling outside the scope of that Act, it is of some guidance and value in the instant case.

In *Reading Company v. Pope & Talbot, Inc.*, 192 F.Supp. 663 (E.D.Pa.1961) aff'd. per cur. 295 F.2d 40 (3rd Cir.1961), a vessel, proceeding up the Delaware River at night, struck an unlighted carfloat which had sunk in the river. The carfloat was approximately 175 to 200 yards from the edge of the dredged channel. Although it was outside the navigable channel, the court found its owners had violated their statutory duty by failing to light the carfloat as it posed a threat to navigation.

■■■ The Wreck Act contemplates a situation where the threat to navigation is a relatively recent occurrence, as in the case of a vessel which sinks, posing an immediate danger to mariners navigating near the vessel, before notice of its location

can feasibly be given. However, the logic behind the Act has greater applicability. More specifically, the owner of a submerged obstruction is in a better position to prevent a collision by lighting the obstruction than a mariner navigating in the vicinity. Consequently, at least until the time when adequate notice can be given to seamen, the onus should be on the owner of the obstruction to prevent a mishap.

At the time of the second collision the plaintiff, pursuant to Coast Guard instruction, had placed a second sign on the outfall line, facing down the river and marking its terminus. Conceivably, had this sign been lit the second collision, which occurred at night, could have been prevented.

■ The plaintiff maintains that since the signs, marking the outfall line, were placed there in accordance with the Coast Guard recommendations, and after their erection had been approved by the Coast Guard, they had satisfied any requirements for adequately marking the pipe. This alone, however, is not sufficient to insulate the plaintiff from a finding of negligence on its part.

As stated by the court in *Lew Warden, Jr. v. City of Los Angeles*, [1975] A.M.C. 970, 974, "The fact that the Coast Guard failed to specify lights on audible devices after its own study was not binding on the trial court on the issue of negligence ...."

In the case at bar, the plaintiff was aware that vessels travel that portion of the Cohansey River adjacent to their plant at night. Further, they were aware that the sign marking the terminus of the outfall line was a daymarker and, as such, was not designed to be seen at night. The plaintiff's own witness, Mr. Bell, testified at trial that he was unable to see the sign, the night of the second collision, while standing on the shore some 320 feet away. (Tr. Vol. 1, p. 109). Additionally, common sense dictates that the best way to insure that the sign be seen at night is to light it.

■ The plaintiff, as owner of a structure which extends into a navigable waterway, has a duty to adequately mark such structure. Failure to do so with an appropriate warning is negligence. *Plantation Pipe Line* at 2558.

■ In the instant case, the Court finds that the plaintiff, knowing of the night traffic on the river, failed to exercise reasonable care by providing only a daymarker to indicate the position of the outfall line within the waterway. However, at the time of the second collision the Local Notice to Mariners had issued and the outfall line had been noted on the Loran Chart. Therefore, the seamen on the barge and tug had been put on notice as to the location of the outfall line, as they had a responsibility to be aware of the contents of the applicable Charts and Notices and failure to do so constitutes negligence. *See, Placid Oil Company v. S.S. Willowpool,* 214 F.Supp. 449, 453 (E.D.Tex.1963). Clearly, then, there was also negligence on the part of the mariners involved in the second collision.

■ Finding both parties negligent, the Court must apply the comparative negligence standard set forth in *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). This standard provides that when two or more parties have contributed by their fault to cause property damage in a maritime collision, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. Under this standard, it is culpability, not the degree of causation on which liability is apportioned. *Port of Seattle v. M/V Saturn,* 562 F.Supp. 70 (W.D. Washington, 1983).

The Court finds the plaintiff, Cumberland County Utilities Authority, to be primarily culpable. It was in the best position to prevent collision with the outfall line by simply lighting the sign that marked its terminus.

Accordingly, the Court finds the defendants Interstate Towing Co. and Gellenthin Bulk Transport to be 40% at fault, and the plaintiff Cumberland County Utilities Authority to be 60% at fault.

For the reasons stated above, the plaintiff's complaint against defendants M/T Delbar, Taylor and Anderson, Delaware River Barge Company and Gellenthin Bulk Transport Company, relating to the first incident, occurring on July 6, 1978, shall be dismissed. As to the second incident, on July 14, 1979, the plaintiff will be awarded 40% of the stipulated damages of $99,876.57 resulting from that collision. Judgment in this amount to be entered against the defendants, Interstate Towing Company, Interstate and Ocean Transport Co. and Gellenthin Bulk Transportation Corp. Each party is to bear its own costs. The Court shall enter the appropriate order.